UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                             :

GEORGE BELL,                               :       05 CV 4532 (ERK)
                                                             :

                    Petitioner,            :       **MEMORANDUM &**
           v.                                 :       **ORDER**
                                                             :

ROBERT E. ERCOLE, Superintendent,        :
Green Haven Correctional Facility,[*]        :

                                           :
                  Respondent.          :
                                           :
-------------------------------------------------------------------- X

KORMAN, J.

      George Bell, who seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, was convicted of murder in the first degree and related offenses arising out of the murder of two people in the course of the attempted robbery of a check-cashing establishment at 94-21 Astoria Boulevard, Queens, New York, at about 7 a.m. on December 21, 1996. The evidence at trial established that, while three accomplices – John Mark Bigweh, Gary Johnson, and a man named "Jason" – waited outside, Bell and another accomplice, Rohan Bolt, entered the store just as it opened for the day. They then demanded money from the owner, Ira "Mike" Epstein, but before Epstein could open the safe, Bell fired three shots into the store's security guard, off-duty New York City Police Officer Charles Davis. Bell then shot Epstein. As both men lay dying, Bell and his accomplices fled, without having gained access to the safe. Police later recovered four discharged 9 mm shell casings from the scene.

---

[*] Robert E. Ercole succeeded William Phillips as superintendent of the Green Haven Correctional Facility after the commencement of this action. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ercole is automatically substituted for Phillips as a party.

**The Evidence At Trial**

<u>Confessions of Petitioner and John Mark Bigweh</u>

Bell was arrested after he left his home with Gary Johnson, shortly after 11:50 p.m. on December 24, 1996. Johnson and another man, Mendez Collier, were also arrested at the same time. Bell was taken to the 109th Precinct, where he was handcuffed to a chair outside the office of Lieutenant William Nevins for approximately three hours. On December 25, at about 4:30 a.m., Detectives Louis Pia and Richard Sica advised Bell of his <u>Miranda</u> rights and secured a written waiver. After an hour of small talk, chiefly about basketball, Detective Pia told Bell that he was there because of the robbery at the check-cashing store. Bell denied any involvement, but, when informed that other suspects were telling police their stories, he said that he had been involved as a lookout on the corner of 95th Street and Astoria Boulevard and had carried a .380 automatic handgun. Bell proceeded to describe in detail what occurred inside the store, relating facts which he could not have known if he were only a lookout. Moreover, the ballistics evidence, of which Detective Pia was aware, established that a 9 mm weapon was used. When pressed on this score, Bell began to cry and admitted being in the store with a 9 mm weapon. He said that he and "Roti" (Rohan Bolt) entered the store and pointed guns at Epstein and Davis while "Gary" (Gary Johnson) and "Carl" (Mendez Collier) served as lookouts and "Jason," the getaway driver, sat at the wheel of a burgundy van with Pennsylvania license plates. Bell also admitted to firing the shots that killed Epstein and Davis. Detective Pia memorialized the statement in writing, and Bell signed each page of the four-page document. At 12:20 p.m., Bell repeated his confession on videotape in response to questions from Peter Reese, an Assistant District Attorney. More than two hours after Bell had videotaped his statement, Detectives Pia and Sica visited Bell in his holding cell and asked him why

he alone had implicated Collier.  Tr. 11829, 11964-65.  Bell said that he falsely accused Collier because he feared that if he implicated John Mark Bigweh, the actual lookout, he and his family would be in danger.  Id.

The jury also heard evidence that petitioner was arrested because he had been implicated in the attempted robbery and murder by Bigweh.  Specifically, without objection, Lieutenant Nevins testified that, after speaking with Bigweh, he convened a meeting "of police officers and detectives who [were] going to go out on the street and apprehend" Bell and his accomplices.  Tr. 11659-61.  Bigweh accompanied the police officers, and he led them to the various locations where each of the individuals he implicated resided and "he pointed them out to [them]."  Tr. 11661.[1]  Moreover, as a result of a telephone call Bigweh placed to petitioner, he and Gary Johnson left petitioner's apartment (in the same neighborhood as the scene of the crime) and were arrested on the street by Lieutenant Nevins and others.  Tr. 11668-69.  Significantly, telephone records established that, at 5:55 a.m., a little over an hour before the attempted robbery and double homicide, Gary Johnson, whom petitioner and Bigweh implicated in their confessions, called petitioner's house twice, during which there were very brief conversations.  Ex. 45; Tr. 12838-39.

The Eyewitness Identification

On December 26, 1996, a lineup was held for an eyewitness, Gregory Turnbull, in which Bell was in position number 6.  Present were Detectives Paul Teknus and Frank Bovino, Sergeant

---

[1] Bigweh's confession, as related by Lieutenant Nevins, did not explicitly identify petitioner as a participant in the offense.  Nevertheless, it contains an accusation that was plainly implicit.  Indeed, for this reason, it would have been error to admit it, had there been a timely objection.  Mason v. Scully, 16 F.3d 38, 42-43 (2d Cir. 1994); People v. Tufano, 69 A.D.2d 826, 827 (2d Dept. 1979).  Bigweh's confession, which was not admitted into evidence, named petitioner and Rohan Bolt as the individuals who fired their weapons at the victims.  Tr. 19-20.

John Russell, Assistant District Attorneys Ira Dorfman and Neil Morse, and defense lawyers Douglas Krieger and Leslie Nizin. Turnbull testified that after he got off the bus taking him to work in the area, he viewed Bell and one of his accomplices (Bolt) over a period of about fifteen minutes as they stood on the corner of 95th Street and Astoria Boulevard and then rushed Davis and Epstein as they opened the check-cashing store. Turnbull first viewed them as he stood in front of the restaurant where he worked, which is on the same block and the same side of the street as the check-cashing store. He said that one of the men was dark-skinned, stood about 5'6" to 5'8", and wore tan construction boots, black jeans, and a blue denim jacket. The other, later identified as Bell, had brown skin, stood about 5'8" to 5'11", and wore tan construction boots, black jeans, and a black goose down jacket. Turnbull crossed the street to visit a Lotto store and newsstand and then crossed back to use a pay phone, from which he continued to view the two men on the corner. For much of that time, the men looked in his direction, toward 94th Street. Turnbull then returned to the Lotto store, from which he continued to look out onto Astoria Boulevard. A short time later, Turnbull saw an older white man (Epstein) and a black man (Davis) open the shutters to the check-cashing store and the two men from the corner move in their direction. Turnbull saw the two men rush Epstein and Davis inside, with Davis putting his hands in the air. Turnbull then heard four gunshots and, seconds later, saw the two men from the corner leave the store. Bell's accomplice walked quickly down Astoria Boulevard in the direction of 95th Street, followed shortly by Bell.

Turnbull testified that at all relevant times, his view was not obstructed, no pedestrians walked by and blocked his view, and the two men he first saw on the corner were not wearing anything that covered their faces. Turnbull further testified that, at 6:45 a.m., when he got off the bus taking him to work, it was semi-light, describing the dawn's early light that precedes sunrise,

Tr. 11417, and it grew lighter by the time he observed them running away after the shooting. Tr. 11393. Turnbull identified Bell as the taller and lighter-skinned of the two men he had seen.

The Jailhouse Informant

During the summer of 1998, while awaiting trial, Bell was incarcerated at Rikers Island, where he came to know another inmate, Reginald Gousse, who was being held on robbery and kidnaping charges. Gousse entered into a cooperation agreement with the District Attorney's Office and testified that Bell had confided to him that he had killed the two men at the check-cashing store.

**The Verdict and Post-Conviction Proceedings**

Petitioner was ultimately convicted of all counts. After the jury declined to impose the death penalty, which the District Attorney had sought, Bell was sentenced to life in prison without the possibility of parole. Six issues were raised on appeal. The Appellate Division addressed in detail only one issue relating to an allegedly improper visit of Jurors Nos. 7 and 9 to the crime scene. Specifically, it held that "the trial court providently exercised its discretion in determining that the conduct of Jurors Nos. 7 and 9 did not constitute misconduct which warranted setting aside the jury's guilty verdict and ordering a new trial." See People v. Bell, 307 A.D.2d 1047, 1048 (2d Dept. 2003). The Appellate Division found Bell's other arguments to be "without merit," id. at 1049, and leave to appeal was denied, People v. Bell, 1 N.Y.3d 568 (Table) (Dec. 30, 2003). Subsequently, he filed an unsuccessful motion to vacate his conviction pursuant to N.Y. Criminal Procedure Law § 440.10 on grounds that are discussed below.

Petitioner's co-defendants Bolt and Johnson were convicted of second-degree murder and other charges after separate jury trials. The convictions were unanimously affirmed. People v. Bolt, 295 A.D.2d 357 (2d Dept. 2002), lv. denied, 99 N.Y.2d 533 (Nov. 7, 2002) (Table); People v.

Johnson, 295 A.D.2d 368 (2d Dept. 2002), lv. denied, 98 N.Y.2d 768 (Oct. 8, 2002) (Table).  Co-defendant Bigweh pleaded guilty to attempted robbery in the first-degree and criminal possession of a weapon in the third-degree.  Although he cooperated with the police early on, he did not enter into a formal cooperation agreement with the Queens County District Attorney's Office until October 28, 1999, several months after the completion of Bell's trial.  After testifying at Bolt's and Johnson's trials, Bigweh was sentenced to five to ten years in prison.

## DISCUSSION

A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), to prevail on a petition for a writ of habeas corpus, a petitioner confined pursuant to a state court judgment must show that the court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "[C]learly established Federal law" refers to holdings of the Supreme Court, as opposed to dicta, as of the time of relevant state court decisions.  Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 653 (2006); Williams v. Taylor, 529 U.S. 362, 412 (2000).  A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 413.  An "unreasonable application" occurs when a "state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Id.  "Unreasonableness is determined by an 'objective' standard."  Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005)

(quoting Williams, 529 U.S. at 409). As Judge Newman observed in Cruz v. Miller, 255 F.3d 77,

86 (2d Cir. 2001):

> [W]e are determining the [objective] reasonableness of the state courts' "decision,"
> 28 U.S.C. § 2254(d)(1), not grading their papers. Several circuits have noted that,
> in making the "reasonable application" determination, they would look to the result
> of a state court's consideration of a criminal defendant's claim, e.g., Neal v. Puckett,
> 239 F.3d 683, 695-96 (5th Cir. 2001); Long v. Humphrey, 184 F.3d 758, 760-61 (8th
> Cir. 1999); Matteo v. Superintendent, 171 F.3d 877, 891 (3d Cir. 1999) (in banc);
> Hennon v. Cooper, 109 F.3d 330, 334-35 (7th Cir. 1997). Although sound reasoning
> will enhance the likelihood that a state court's ruling will be determined to be a
> "reasonable application" of Supreme Court law, Hennon, 109 F.3d at 335, deficient
> reasoning will not preclude AEDPA deference, see Neal, 239 F.3d at 696; Hennon,
> 109 F.3d at 335, at least in the absence of an analysis so flawed as to undermine
> confidence that the constitutional claim has been fairly adjudicated.

Moreover, the Supreme Court has held that "unreasonableness" should not be conflated with

"clear error" because "[t]he gloss of clear error fails to give proper deference to state courts . . . ."

Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal citations omitted). Nevertheless, an error

satisfying these requirements may be deemed harmless, thereby precluding habeas relief, if it did

not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht

v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

(1946)). This standard applies even when the state courts do not reach the harmlessness inquiry.

Fry v. Pliler, ___ U.S. ___, 127 S. Ct. 2321, 2327 (2007). Similarly, a state court's decision on the

merits is accorded AEDPA deference even where it "does not explicitly refer to either the federal

claim or to relevant federal case law." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).

B. The Grounds for Relief

Petitioner seeks habeas corpus relief here on a number of separate grounds. I deny the

petition because the holding of the Appellate Division that petitioner's claims were without merit

was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, or because any error was harmless.

### 1. Alleged Juror Misconduct

Petitioner's first ground for relief, which relates to alleged juror misconduct, requires a somewhat lengthy factual backdrop. On June 14, 1999, after the jury returned a guilty verdict, Justice Cooperman conducted a voir dire of the jurors to determine whether any of them had a state of mind that would prevent them from following the law and rendering an impartial decision during the penalty phase of the trial. Before the questioning, Juror No. 7 sent a letter to the judge through a court officer, stating that she could not vote for either the death penalty or a sentence of life imprisonment because she had reasonable doubts that Bell was guilty, and that, in voting to convict, she had "caved in" to the other jurors. When later questioned by Justice Cooperman, Juror No. 7 reiterated that she could not, according to her beliefs, sentence Bell to either life imprisonment without the possibility of parole or the death penalty, nor could she find that the aggravating factors were proven beyond a reasonable doubt by virtue of the jury's verdict. Outside the presence of Juror No. 7, defense counsel asked the trial judge to pose some open-ended questions in order to determine why she felt the way she did. The prosecution opposed this request. The trial judge then excused Juror No. 7 without further questioning and replaced her with an alternate juror on the sentencing panel.

On June 21, 1999, when the sentencing phase was scheduled to begin, Bell moved to set aside the verdict and declare a mistrial, pursuant to N.Y. Criminal Procedure Law § 330.30(2), on the ground that two jurors had made separate, unauthorized visits to the crime scene during the trial. Annexed to the moving papers was a sworn affirmation from the original Juror No. 7, dated June

20, 1999, stating that she had driven through the crime scene during the trial and observed that advertisements she saw on the window of the Lotto store would have made it impossible for Turnbull to observe the robbers. She also wrote that she told Juror No. 4 about her observations and that Juror No. 9 told the jury during deliberations that she had stopped at a red light near the scene and that there were no obstructions that would have interfered with Turnbull's view. The trial judge deferred his consideration of the matter until after the conclusion of the penalty phase.

On June 28, 1999, after the jury returned sentences of life imprisonment without the possibility of parole, Justice Cooperman held a hearing on the defense motion. Among other preliminary requests, the defense asked Justice Cooperman to disclose any notes that he received from the jurors during the course of the trial, including the note from Juror No. 7 on June 14. The trial judge denied that request, though Juror No. 7's note to Justice Cooperman was later made available to counsel as part of the court file. Justice Cooperman then brought Juror No. 7 in for questioning. Upon learning that Juror No. 7 was not represented by counsel, Justice Cooperman asked whether she had spoken to an attorney. Juror No. 7 replied that she had spoken with one lawyer, to whom she had been referred by petitioner's counsel, before she signed her affidavit. Tr. 14215-16. This attorney told her she could be held in contempt of court, but "you have to do what you feel is right." Tr. 14219, 14196. She also spoke to a second lawyer before she came to court who told her that she might be held in contempt of court. Tr. 14196-97. The lawyer explained to her that "contempt means doing something wrong before the court." Id. Although "he didn't know if this was contempt, however, if it was contempt, I could get as much as a year in jail." Tr. 14197. The following colloquy then ensued.

THE COURT: Well, I believe you should have a lawyer here to advise you of your rights as an attorney representing you, not some casual off-the-cuff remark. It's pretty serious business what you just said. You understand that?

FORMER JUROR NO. 7: A year in jail?

THE COURT: Well --

FORMER JUROR NO. 7: No, well, everybody was telling me, but they didn't think anything was going to happen.

THE COURT: Oh, really. Lawyers told you they didn't think anything was going to happen. I suggest you get a lawyer who may think something bad can happen.

FORMER JUROR NO. 7: Okay

Id.

The following day, Juror No. 7 returned with her attorney, Russell Morea, and the matter was adjourned at his request until July 6, 1999. When Juror No. 7 returned on that day, Justice Cooperman began questioning her. She immediately asserted her privilege against self-incrimination. Tr. 14207. Justice Cooperman then told her that he was going to ask some preliminary questions that did not relate to anything she did during the trial and which he told her she had to answer. Id. The upshot of this questioning was that Justice Cooperman granted the request of Juror No. 7 that he appoint another attorney for her. The hearing was adjourned for this purpose.

When the hearing resumed on July 12, Justice Cooperman questioned Juror No. 7 about her affirmation. She replied that petitioner's lawyers had prepared it for her. Tr. 14234. When Justice Cooperman asked Juror No. 7 substantive questions, she again invoked her Fifth Amendment right not to testify. The defense then asked that the trial judge or the prosecution grant Juror No. 7 immunity. Both declined to do so. Juror No. 7 was then excused.

The next day, Juror No. 4 testified that Juror No. 7 said that she entered the Lotto store from which Turnbull viewed the petitioner and that she did not believe Turnbull could have seen what he said he did because the store's door was covered with advertisements. These statements, if true,

differ from those in Juror No. 7's affirmation, which stated that she saw advertisements on the store window, not the door, and that she had only driven through the area, not entered the store in question. Juror No. 4 also stated that Juror No. 7 had told her after the verdict, but before the penalty phase voir dire, that she dreamed she went to dinner with Bell and his mother and together they cried about the verdict.

Juror No. 9 testified that, one day during the trial, while driving from her job in Manhattan to her home in Queens, she was briefly stopped at a red light on Astoria Boulevard at 94th Street, near the scene of the crime. Juror No. 9 said that, while she did not look at anything in particular, she saw the whole area, including the Lotto store and the check-cashing store. She said that she casually mentioned to other jurors that she had been stopped at the light, but did not speak of it more and did not make or convey any specific observations. The trial judge denied defense counsel's requests to ask Juror No. 9 follow-up questions and to question the other remaining jurors about whether she discussed her observations during deliberations.

Justice Cooperman ultimately denied Bell's motion to set aside the verdict. People v. Bell, Ind. No. 128/97, 1999 NY Slip Op. 40005U, 1999 WL 33313139 (N.Y. Sup. Ct. July 27, 1999). Specifically, he concluded "[t]here is no evidence that Juror No. 7 made a deliberate intentional crime scene visit to add to or clarify the evidence presented at trial, to verify the reliability of prosecution witnesses, or engaged in 'conscious contrived experimentation.'" Id. (internal citation omitted). Justice Cooperman also found that Juror No. 9 had not committed misconduct, and that there was no issue at trial regarding whether there were obstructions on Astoria Boulevard that would have blocked Turnbull's view. On direct appeal, the Appellate Division assumed that Juror No. 7 did, in fact, visit the crime scene, but agreed with the trial judge that such conduct "did not

constitute misconduct which was prejudicial to the defendant's substantial rights." People v. Bell, 307 A.D.2d 1047, 1049 (2d Dept. 2003).

Petitioner argues that he was denied his right to a fair trial when Jurors Nos. 7 and 9 made separate, unauthorized visits to the crime scene, thereby injecting non-record evidence into the jury's deliberations. In support, he cites two Supreme Court cases holding that "the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Parker v. Gladden, 385 U.S. 363, 364 (1966) (granting relief where bailiffs had made comments to jurors that the defendant was "a wicked fellow" and guilty of the crime charged) (quoting Turner v. Louisiana, 379 U.S. 466, 472-73 (1965) (reversing conviction where deputy sheriffs who testified for the prosecution had charge of the jury during the trial and fraternized with jurors outside the courtroom during their service)).

This case is essentially one involving the exposure of a jury to extra-record information. While petitioner's argument is based on the premise that the visit by the juror to the crime scene would entitle him to relief here, without regard to whether her observations prejudiced him, the law is otherwise. Thus, the Second Circuit has generally "'treated the issue of extra-record infiltration only from the perspective of the resulting prejudice to the defendant, without discussing the source of the error.'" Loliscio v. Goord, 263 F.3d 178, 185 (2d Cir. 2001) (quoting United States v. Simmons, 923 F.2d 934, 943 n.4 (2d Cir. 1991)). Because the acquisition or the communication of extra-record evidence is presumptively prejudicial, the burden rests on the prosecution to show that such contact was harmless. Remmer v. United States, 347 U.S. 227, 229 (1954). Of course, to the extent that the resolution of the issues of harmless error under the Brecht standard turns on which

party bears the burden of proof, the burden would be on the prosecutor regardless of the nature of the error. O'Neal v. McAninch, 513 U.S. 432, 442 (1995). Nevertheless, as my colleague Judge Gleeson and his co-authors have observed, "[d]espite this [Remmer] presumption, the Second Circuit has generally sustained district court rulings that exposure to extra-record information was harmless." Gordon Mehler, John Gleeson & David C. James, Federal Criminal Practice: A Second Circuit Handbook § 23C-4 at 498 (6th ed. 2005).

The jury's exposure to extra-record information here was harmless under any standard. This is particularly so with respect to the Brecht standard that an error is harmless if it does not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. The affirmation of Juror No. 7, which petitioner submitted in support of his motion for a new trial, stated that she had driven through the crime scene during the trial and observed that advertisements on the window of the Lotto store would have made it impossible for the eyewitness to observe the robbers. The next day, Juror No. 4 testified that Juror No. 7 said that she entered the Lotto store from which Turnbull viewed the defendant, and that she did not believe Turnbull could have seen what he said he did because the store's door was covered with advertisements.

The observation of Juror No. 7, as she related it in her affidavit or as Juror No. 4 described how it was related to her, was plainly helpful to the defendant and prejudicial to the prosecution. Moreover, because Juror No. 9 did not make any specific observations about the area where the crime was committed, much less any particular observation relevant to Turnbull's ability to view the defendant at the crime scene, any error was harmless.

Alternatively, petitioner argues that the trial court denied him a fair opportunity to develop his claim of juror misconduct by refusing to disclose the contents of a note from Juror No. 7, failing

to ask follow-up questions of Juror No. 7 during the post-verdict voir dire, denying defense counsel's requests to pose additional questions to Juror No. 9 during the hearing on the motion to set aside the verdict, precluding testimony from or discussions with other members of the jury, and threatening Juror No. 7 with contempt proceedings.

As a threshold matter, three facts bear noting. First, while Justice Cooperman did not immediately disclose the note he received from Juror No. 7, it was later made available to counsel. Second, the note did not say that Juror No. 7 had visited the crime scene. Nor did the post-verdict voir dire focus on that issue. Third, it was the attorneys with whom Juror No. 7 had previously consulted, who advised her that she could be held in contempt and sentenced up to a year in jail, although they did not think it was likely. Justice Cooperman did seek to impress upon her that she could not assume, as she had been advised, that her conduct was necessarily without consequence. While he did so in language that was stronger than necessary, this was not a case in which the defense was without access to the juror whose conduct was at issue. On the contrary, petitioner's lawyers prepared the affidavit of Juror No. 7 that they submitted in support of the motion for a new trial. Tr. 14234, 14245-46. Petitioner does not allege that his attorneys did not have a complete opportunity to debrief her at the two meetings that they had with her prior to the execution of her affidavit. Tr. 14245. Nor does he allege that there was any relevant information that was not brought to the attention of the trial judge. If anything, for the purpose of the decision on petitioner's motion for a new trial, petitioner had the advantage of having the affidavit of Juror No. 7 accepted as true without subjecting her to cross examination.

In Remmer, upon which petitioner relies, the Supreme Court held that, "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial

14

about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." 347 U.S. at 229. In such a case, the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id. at 230. The trial judge here held a hearing, although the circumstances here are not precisely those which were alluded to in Remmer. The evidence established that petitioner was not prejudiced by the jurors' individual visits. Because Juror No. 7's observations, if credited, were favorable to the defendant, and Juror No. 9 made no specific observations relevant to the issues before the jury, further development of the record was not required. See United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006) (holding that an inquiry into juror misconduct "should end whenever it becomes apparent to the trial judge that reasonable grounds to suspect prejudicial jury impropriety do not exist") (internal quotation marks and citations omitted).

In his reply brief, petitioner asks for discovery and an evidentiary hearing related to his claim of juror misconduct. Because petitioner did not "fail" to develop the record in state court – rather, his attorneys' requests for further questioning of the jury were denied by the trial judge – the restrictions on a hearing to develop the record contained in 28 U.S.C. § 2254(e)(2) do not apply. See 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 20.2b at 907-08 n.22 (5th ed. 2005) (citing cases). Under those circumstances, it is proper to apply the pre-AEPDA rule that, "[w]here a habeas petitioner alleges facts that, if proven, would entitle him to relief, a federal court must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in state court." Amiel v. United States, 209 F.3d 195, 199-200 (2d Cir. 2000) (quoting Strouse v. Leonardo, 928 F.2d 548, 554 (2d Cir. 1991)); see also Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled in part by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992); Davis

v. Lambert, 388 F.3d 1052, 1061-62 (7th Cir. 2004).  Because the facts alleged in the affidavit of Juror No. 7, even if true, did not entitle him to relief, and because the hearing he received in state court sufficiently developed the record while respecting the confidentiality of jury deliberations, a hearing is not required here.

### 2. Exclusion of Evidence

Petitioner's next claim for relief is based on a litany of evidentiary rulings by Justice Cooperman, both before and during the trial.  Petitioner divides the rulings at issue into three categories: challenges to Turnbull's eyewitness identification, challenges to petitioner's confession, and challenges to the testimony of Gousse – the jailhouse informant.  Many of these rulings and the objections on which they were based are problematic, particularly because they were made during the course of a trial that could have resulted in the imposition of the death penalty.  Petitioner does not rely on any particular ruling as a basis for relief.  Instead, he relies on their cumulative effect.  I address them in turn.

### a. Challenges to the Identification

In the first category, petitioner takes exception to decisions that limited his ability to challenge Turnbull's eyewitness identification, specifically the court's rulings precluding (1) cross-examination of Detectives Bovino and Lieutenant Nevins, and testimony from Bell's mother and Collier, regarding the existence of posters offering a reward for information related to the shooting; (2) cross-examination of Assistant District Attorney Morse regarding how many lineups he had attended in his career; how many lineups he attended on December 26, 1996; and how many lineups he had attended since December 26, 1999; (3) testimony from Bell's mother that she saw her son

at home, in bed, about an hour after the shootings; and (4) the admission of Bertha Ligon's 911 call after she had already testified as to its contents.

(i) <u>The Reward Posters</u>

On cross-examination, Turnbull denied learning that one of the victims of the shooting was a police officer prior to viewing the lineup. He also denied knowing that a $10,000 reward had been offered for information leading to the arrest and conviction of those responsible for the murders and said that he did not expect to receive such a reward. Tr. 11470. The trial judge sustained objections to questions from the defense as to whether Turnbull had seen any billboards or posters bearing the phrase "Cop Shot" and offering a reward for information about this crime. Later, the trial judge sustained objections to questions about the reward-offer during the defense's cross-examination of Detective Bovino and Lieutenant Nevins. Also precluded was testimony from Collier and Esther Bell that they had seen reward posters, and that one such poster was affixed to the door of the restaurant where Turnbull worked two days after the crime and three days before he identified Bell in the police lineup. Petitioner's counsel was permitted to ask whether Turnbull expected "to receive any reward money in the event that Mr. Bell is convicted of this crime," <u>id.</u>, and Turnbull responded that he did not know "until right this moment" that there was any reward. <u>Id.</u> Petitioner does not allege that Turnbull sought or received a reward.

The evidence that there were reward posters in the area, which petitioner was precluded from introducing, provided relevant circumstantial evidence tending to contradict Turnbull's testimony on an issue relating to his motive to testify falsely. Petitioner's counsel should have been permitted to ask Turnbull if he had seen the reward posters and to offer evidence that they were in the area where Turnbull could likely have seen them. Indeed, the New York Court of Appeals has held

17

expressly that "extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground." People v. Hudy, 73 N.Y.2d 40, 56 (1988).

Nevertheless, my reading of the record persuades me that the preclusion of this evidence did not affect the outcome of the trial. First, the attack on Turnbull's identification focused largely on the accuracy of his identification, rather than his motive to testify falsely. Moreover, his testimony regarding the circumstances of the identification at the lineup indicated that he did not readily identify petitioner in the manner that one would expect from a witness falsely identifying someone to obtain a reward. Tr. 11462-66. Turnbull did not initially identify petitioner when he first saw the participants in the lineup in a sitting position. Instead, he asked if they could stand. After looking at each of them carefully and asking that they turn left and right, he still did not make an identification. Instead, he asked that the participants holding numbers two and six stand, because they were of the same complexion. Only after they sat down did Turnbull identify petitioner.

Indeed, in his summation, the prosecutor highlighted various aspects of Turnbull's conduct that indicated he was a reluctant witness, and the prosecutor offered the following explanation:

> Now, was his reluctance understandable to be involved? Well, I ask you to place yourselves in a similar position. Think of how you felt when you received the summons for jury duty, okay. A little of reluctance, okay.
> Then you came to Court the first thing you heard from the Judge, the trial could be three or four months. My God, do you think your reluctance grew a little bit.
> Then you hear it's a Capital Case. How did you feel then a little reluctance? How about your fellow jurors, most of them are gone. Do you think they felt reluctant?

Tr. 13125.

This consideration aside, the eyewitness identification and petitioner's confession provided corroboration for each other. Simply stated, it was unlikely that the jury would discredit Turnbull's

identification as a lie in order to obtain a reward, when the person he selected had previously confessed and had been implicated in a confession of an accomplice.

(ii) <u>The Cross-Examination of ADA Morse</u>

Turnbull also testified about the circumstances and conduct of the lineup, as did Detective Bovino. Both said that Turnbull asked Detective Bovino if Nos. 2 and 6 – a filler and Bell, respectively – could stand up. Both also said that Detective Bovino asked Nos. 2 and 6 to stand up and that, in fact, both did so. In response, two of Bell's former defense lawyers, both of whom attended the lineup, testified that Detective Bovino asked only No. 6 to stand up. Both attorneys were cross-examined as to their ability to recollect details of the lineup. The District Attorney later called ADA Morse as a rebuttal witness, and he testified that Nos. 2 and 6 were asked to stand and turn at the same time and that they did so. On cross-examination, the defense asked ADA Morse how many lineups he had attended in his career, how many lineups he attended on December 26, 1996, and how many lineups he had attended since December 26, 1999. The trial judge sustained objections to each of those questions. At sidebar, the defense said that it wanted to elicit the fact that ADA Morse had attended approximately 350 lineups in his career, including 75 to 100 since December 26, 1996, and ten on that date alone, in order to challenge his testimony that he recalled that particular lineup. The trial judge continued to sustain the objections. Tr. 12951.

I agree with petitioner that the trial judge erred in precluding the defense from questioning ADA Morse about his ability to recall past lineups. The objection by the district attorney, that this evidence "is irrelevant to Mr. Morse's ability to recall this particular lineup," was simply wrong. The number of lineups in which Morse participated was clearly relevant to his ability to recall the one in which petitioner was identified, and petitioner should have been permitted to impeach

Morse's testimony by showing he had attended more than 350 lineups and more than 75 since the lineup at issue here.

Nevertheless, further cross-examination established that ADA Morse did not take any notes related to this lineup and was relying on his unaided memory with regard to events that had occurred two and a half years earlier. More significantly, petitioner's counsel was not precluded from asking Morse why he was able to recall the events of this particular lineup. He very likely chose not to pose such a question because this was not an ordinary case that would blend in memory with the seventy-five other cases (many of which probably were not even homicide cases) that took place since the lineup at issue here. This was a double homicide case in which one of the victims was a New York City Police Officer. Indeed, petitioner's counsel suggested to the jury that this was of particular concern to law enforcement officers involved in the investigation. Tr. 10987, 11452. And it was also one in which the District Attorney sought the death penalty. Moreover, ADA Morse was merely a rebuttal witness, corroborating the earlier testimony of Turnbull and Detective Bovino, and any insinuation that ADA Morse's recollection was flawed would only have undermined the probative value of his corroborative testimony on an issue that may not have affected the verdict in any event.

(iii) <u>The Alibi Testimony of Esther Bell</u>

Petitioner's mother, Esther Bell, with whom he lived at 98-07 Northern Boulevard, several blocks southeast of the check-cashing store, would have testified that she saw her son in bed at approximately 8:10 a.m. on December 21, 1996, Tr. 12540-41, approximately an hour after the murders. The trial judge precluded testimony on this subject because the defense failed to give the prosecution notice of alibi evidence, as required by N.Y. Criminal Procedure Law § 250.20. There

is arguably some merit to the argument that the trial judge abused his discretion by precluding Esther Bell's testimony that her son was in bed an hour after the shootings took place, notwithstanding the failure of the defense to provide the notice of alibi. Nevertheless, any error in this regard was harmless because petitioner lived near the crime scene – three-fifths of a mile to be exact – and had more than ample time to return home before he was observed by his mother. Tr. 12524. Indeed, in arguing that a notice of alibi was not required, petitioner's counsel acknowledged that "[t]here is no question . . . that a person could have committed this crime on Astoria Boulevard and 94th Street and been in bed at 7:30 in the morning." Tr. 12532. This concession was confirmed by petitioner's confession where he said that, immediately after the crime, he went home, took "his clothes off that he was wearing, drops them on the floor of his bedroom" and "a short time after that" his mother entered the room. Tr. 11808. Under these circumstances, the "alibi" testimony, which came from an obviously interested witness, would have been of limited probative value and was unlikely to have affected the verdict in the face of other evidence of petitioner's guilt.

### (iv) Bertha Ligon's 911 Call

Bertha Ligon, who lived directly across the street from the check-cashing store, testified that she briefly saw four people enter the store that morning. She recognized one as Epstein, the store's owner, and she later learned one was Davis, the off-duty police officer. Ligon testified that she only saw the other two men from behind and that one of them was wearing a green army jacket. Ligon also testified that she heard gunshots and that the man in the green jacket left the store. By contrast, Turnbull testified that one of the men who entered wore a blue denim jacket and one wore a black goose down jacket.

Ligon called 911 and told the operator that the man she saw leaving the store wore a green jacket. She also testified that she did not recognize any of the men she later saw in a police lineup, as she did not see the faces of the perpetrators. The defense sought to introduce into evidence Ligon's 911 call. The trial judge precluded it on the grounds that it was cumulative of her testimony. Another defense witness, Jeanette Felix, also testified that she saw a man in a green jacket leave the store. Yet a third eyewitness, who was called by the defense, testified (by way of a stipulation) that one of two men she saw running away wore a light gray jacket and the other wore a light jacket. Tr. 13037.

The ruling precluding the admission of Bertha Ligon's 911 call, though error, was harmless. Ligon testified to all of the facts contained in that call. Significantly, the prosecutor did not cross-examine her in a way that challenged the truthfulness of her testimony regarding the color of the coat worn by one of the perpetrators. Nor did he suggest that it was a recent fabrication. Instead, the prosecutor relied on her testimony as corroborating the testimony of Turnbull. Thus, in his summation, he observed that Turnbull "describes the robbery the way Bertha Ligon describes it, from her vantage point. He describes how he sees these two men behind the owner and the security guard pushed into the store. That's what Bertha Ligon says." Tr. 13130-31.

In his Appellate Division Brief, petitioner argued that "when the prosecution challenged Ligon's reliability, by cross-examining about her eyesight and whether she got a 'good look' at the suspects, it opened the door to the 911 call." Brief for the Defendant-Appellant at 46. While the prosecutor did pose these questions, they did not suggest that Ligon was lying. Instead, they went to the issue of her ability to make reliable observations, an issue which the introduction of the 911

tapes would not have addressed. Under the circumstances, even if error, the lost opportunity to bolster her testimony could not have had an effect on the outcome of the trial.

### b. Rulings Related to the Confession

In this category, petitioner contests the decisions that limited his ability to challenge his confession, specifically the trial judge's rulings precluding (1) expert testimony regarding the phenomenon of false confessions;(2) testimony from Bell's school psychologist regarding his low IQ test score and testimony from Bell's mother on his need for special education and his lack of experience with the criminal justice system; (3) cross-examination of Detective Pia with respect to his ability to recall events and the methods by which he allegedly induced Bell's statement; (4) testimony from Collier regarding Bell's treatment in police custody; and (5) questions regarding the description and arrest of the unknown co-conspirator named "Jason."

### (i) The Exclusion of Expert Testimony

The defense sought to present expert testimony regarding false confessions in order to establish that such confessions may be elicited by means other than physical coercion. The evidence would have addressed the mistaken belief that an innocent person would never confess and explained how "the tactics used during Mr. Bell's interrogation are precisely those that, relevant studies indicate, create a risk of false or involuntary confessions." Affirmation for Motion In Limine at 4. The motion was not accompanied by the affidavit of a proposed expert relating to the substance of his testimony, his qualifications, or his conclusion that the tactics used during the interrogation were likely to yield a false confession. Moreover, petitioner's memorandum of law accompanying his offer of proof clarified that his expert would not testify that he "possessed characteristics that made it more likely that he would confess falsely to the police." Mem. of Law in Supp. of Motion

In Limine at 7 n.2. Instead, "the expert will testify solely about various aspects of the general phenomena of false confessions . . . ." Id. Indeed, petitioner did not submit an affidavit alleging that his confession was false, nor did he so testify. Petitioner's offer of proof was essentially an essay surveying the published literature and studies, by which "researchers have demonstrated that those techniques, while often successful in inducing truthful inculpatory statements, also create a serious risk that a suspect will confess falsely." Affirmation for Motion In Limine at 5.

Justice Cooperman denied the defense's request to admit expert testimony, concluding that the jury could determine the voluntariness of Bell's statements based on the facts presented and that expert testimony on false confessions does not pass the Frye test of general acceptance in its field. People v. Bell, Ind. No. 128/97, slip op. at 3-4 (N.Y. Sup. Ct. Apr. 28, 1999). This decision is consistent with a long line of New York cases, of which the most recent, People v. Wiggins, 16 Misc.3d 1136 (N.Y. Sup. Ct. 2007), contains a particularly thoughtful discussion of the issue.

Because the Supreme Court has never squarely addressed the issue, the decision was not contrary to any Supreme Court holding, nor did it constitute any unreasonable application of Supreme Court precedent. See Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); see also United States v. Scheffer, 523 U.S. 303, 309-10 (1998) (upholding exclusion of expert testimony regarding polygraph examination under rules designed to prevent admission of unreliable testimony). Particularly apposite here is the holding of the Supreme Judicial Court of Massachusetts, which upheld the exclusion of the testimony of Professor Saul Kassin, one of the scholars on whose work petitioner also relied. Commonwealth v. Robinson, 449

Mass. 1, 5-6, 864 N.E.2d 1186, 1189-90 (2007). The Supreme Judicial Court summarized the proffered evidence as follows:

> Professor Kassin is a professor of psychology at Williams College who has authored books and articles concerning police interrogation and confessions, an area, according to him, of recognized scholarly study. He has conducted controlled experiments testing his theories and had previously testified in other jurisdictions as an expert on interrogation and confessions. His fellow "experts" were unanimous that false confessions occur, and in his opinion, certain traditional methods of police interrogation increase the likelihood of a false confession. For example, according to Professor Kassin, threats, promises, and moral issues may have an impact on a suspect's thought process, including his consideration of the costs and benefits of cooperation. Although he admittedly had not tested the defendant in the present case and could not assess his vulnerability to pressure, the professor opined that the techniques used by Detective Kelleher were psychologically "powerful" and had the potential of eliciting false confessions from innocent suspects. He also stated that his research indicates that jurors are not well equipped to assess the interaction between interrogation methods and confessions. Nevertheless, on cross-examination the professor conceded that there was no empirical data on the number of false confessions, and that there is no scientific basis for distinguishing true from false confessions. Indeed, he admitted that one of his articles stated, "Further research in the field is sorely needed. . . . [T]he current empirical foundation may be too meager to support recommendations for reform or qualify as a subject of scientific knowledge." The professor also said that, in fact, in mock jury experiments, jurors were able to distinguish accurately voluntary from involuntary confessions. He agreed that he could not say that lay people could not accurately assess the techniques that would cause false confessions.

Id. In a footnote, the Supreme Judicial Court observed:

> The only significant experiment described by Professor Kassin apparently involved confronting student typists with a witness who claimed to have seen the students touch a key they had been instructed not to touch. The students consistently denied hitting the key until they were confronted by the witness. After that, sixty-nine percent of them admitted touching the key. There was no testimony that the typists knew that, in fact, they had not touched the key during the experiment. Professor Kassin also acknowledged that this was not the same as people "confessing to a crime with severe, long-term consequences."

Id. at 1190 n.7. Under these circumstances, the Supreme Judicial Court concluded that Kassin's proposed testimony did not meet the requirements for the admissibility of expert testimony in

Massachusetts, namely "general acceptance in the scientific community or [a] showing that the evidence is reliable or valid through an alternative means." Id. at 1189.

As far as I can see, there is little in the published literature inconsistent with Professor Kassin's testimony in Commonwealth v. Robinson. Indeed, in the article which petitioner cited in his Motion In Limine, Professor Kassin writes that, "[a]lthough many instances of false confessions have been documented throughout history, it is impossible to determine or even estimate the risk under varying circumstances." Saul M. Kassin & Karlyn McNall, Police Interrogations and Confessions – Communicating Promises and Threats by Pragmatic Implication, 15 Law and Hum. Behav. 233, 248 (1991). Professors Ofshe and Leo observe that, "[w]hile some scholars attempt the analysis of false confessions separately from that of true confessions (see, e.g., Wrightsman and Kassin, 1993), the similarities between true and false confessions are more impressive than their differences." Richard J. Ofshe & Richard A. Leo, The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions, Studies in Law, Politics & Society at 3 (1997). Professors Ofshe and Leo do observe that "it is not uncommon for suspects – especially highly suggestible ones such as the mentally handicapped, juveniles, and individuals who are unusually trusting of authority – to give false confessions in response to police inducements that do not legally qualify as coercive or fundamentally unfair." Richard J. Ofshe & Richard A. Leo, The Decision to Confess Falsely: Rational Choice and Irrational Action, 74 Denv. U. L. Rev. 979, 1117 (1997). Petitioner, however, acknowledged that his proffered expert would not testify that petitioner "possessed characteristics that made it more likely he would confess falsely to the police." Mem. of Law in Supp. of Motion In Limine at 7 n.2.

This is not the only reason why the exclusion of the evidence does not warrant relief here. Petitioner failed to provide an affidavit or to testify at the suppression hearing, even though he had no reason to remain silent. Any testimony he gave at the suppression hearing could not have been used against him, Simmons v. United States, 390 U.S. 377, 393-94 (1968), and he did not have any prior convictions that could have been used to impeach his credibility at trial. Cf. United States v. Mullens, 536 F.2d 997, 1000 (2d Cir. 1976) (observing that the defendant chose not to take the stand during the suppression hearing to rebut the version of the events offered by the prosecution's witnesses, although he might have done so without risk that anything he said there could later be used against him). Without testimony by the "principal witnesses on [petitioner's] side," to borrow a phrase from Judge Posner in an analogous case, Pecoraro v. Walls, 286 F.3d 439, 446 (7th Cir. 2002), or a convincing alibi, it seems unlikely, if not inconceivable, that a jury would have acquitted petitioner based on expert testimony that, while the tactics used by the police during the interrogation could induce truthful confessions, they were also associated with false confessions.[2] Such an outcome is particularly unlikely in a case in which an eyewitness and an accomplice corroborated the confession, and in which telephone records established that sixty-five minutes prior to the attempted robbery and double homicide, Gary Johnson, whom petitioner and Bigweh identified as one of their accomplices, called petitioner's home. (Johnson had also implicated petitioner in a confession that was not admitted at the trial.) Specifically, the calls from Johnson came at "5:54, and 47 seconds in the morning" and "at 5:55:07 in the morning." Ex. 45. The first

_____

[2] In United States v. Hall, 974 F. Supp. 1198 (C.D. Ill. 1997), the principal case relied upon by petitioner, the district court held that Dr. Ofshe could testify "that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in Hall's interrogation in this case." Id. at 1205.

call lasted eleven seconds and the second lasted one minute and 46 seconds. Tr. 12254-55. Notwithstanding the effort of petitioner's sister to explain the calls away by testifying that they were for her, Tr. 12838-39, they constituted a compelling piece of corroborating circumstantial evidence that the jury asked for during its deliberations. Tr. 13397.

There is one final consideration, apart from the corroborative evidence, that undermines the claimed prejudice resulting from the exclusion of the proffered testimony. New York allows a defendant to relitigate the issue of the voluntariness of his confession before the jury, notwithstanding a pretrial ruling denying the motion to suppress the confession. The defendant is also permitted to challenge the truthfulness of his confession. While the jury here was instructed that these were two separate and distinct issues, Tr. 13293, as a practical matter, petitioner's argument melded the two of them into one. Specifically, he argued that he was coerced into making a false confession. As his attorney told the jury, "[t]he videotape is a product of terror, not a statement of truth." Tr. 13083. Thus, the jury could not conclude the confession was false without first considering whether it was voluntary. On this score, the jury was instructed, in relevant part:

> Our law does not specifically define when a statement is "voluntarily made."
> Instead, it defines when a statement is "involuntarily made." In general, our
> Criminal Procedure Law provides that a statement that a defendant is "involuntarily
> made" and therefore may not be considered by the jury, if it is obtained by the police
> or by a prosecutor. One; by means of use of force or by threats of the use of force,
> or two; by means of deception, trickery or promises likely to induce an unwilling
> statement. Three, by means of any other improper conduct or undue pressure which
> impaired the defendant's physical or mental condition to the extent of undermining
> his ability to make a choice whether or not to make a statement.

Tr. 13292. These considerations are those which the scholarly writings suggest may lead to a false confession. See e.g., Ofshe & Leo, supra, at 1117-18 ("The most common type of false confession

is elicited through tactics that depend on communicating obvious or implied threats.")[3]  Similarly, in the principal case upon which petitioner relies,

> Dr. Ofshe testified that no one factor or combination of factors could guarantee a false confession but that some factors might heighten the likelihood of one.  While a number of factors were present in both true and false confession cases, a major distinguishing factor for false confessions is the interrogator's continued use of coercion either through false accusations or false promises of leniency.

United States v. Hall, 974 F. Supp. 1198, 1204 (C.D. Ill. 1997).  Thus, the jury's threshold determination of the voluntariness of the confession necessarily involved consideration of many of the factors that are said to be identified as relevant to its truthfulness.  Moreover, the instruction to the jury that "the People are required to prove to your satisfaction beyond a reasonable doubt that each statement was 'truthful,'" Tr. 13293, constituted a signal to the jury that the truthfulness of petitioner's confessions was not to be presumed.


### (ii) The IQ and Special Education Testimony

The trial judge precluded testimony from Marni Cohen – a school psychologist who had administered an IQ test to Bell in 1994 – that he had an IQ of 74.  The ground for the objection was that the defense failed to provide notice of psychiatric evidence, as required by N.Y. Criminal Procedure Law § 250.10.  It is hardly clear from the language of § 250.10 that it encompasses evidence of IQ.  Indeed, at the penalty phase, the defense once again offered this evidence, without

---

[3] The parenthetical above refers to the tactics that lead to "the most common type of false confessions."  Ofshe and Leo list others that fall into the category of tactics which – in the words of the jury charge – "impair the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement."  See Ofshe & Leo, supra, at 1117-18.

comporting with N.Y. Criminal Procedure Law § 400.27(13)(b), which prescribes a similar notice requirement for the death penalty phase of the trial. The trial court denied the prosecutor's motion to have petitioner examined and permitted her to testify. People v. Bell, 181 Misc. 2d 186 (Sup. Ct. Queens Co. 1999). Cohen testified at the penalty phase that she had administered an IQ test to petitioner in 1994, and that his full-scale IQ at the time was 74. While this was a comparatively low IQ, she testified that petitioner was not mentally retarded. Tr. 13741. Specifically, she testified that such a diagnosis could not be made without an adaptive functioning test. "In order to classify an individual as mentally retarded, they must score below 70 on both the IQ score and the adaptive behavior score. Thus, they are only administered when a student scores below 70 on an IQ score." Tr. 13761. The adaptive functioning test is only "when you have an idea that you're going to classify that student as mentally retarded, and then you need to administer it, but if I get a [IQ] score above 70, I would never administer it." Tr. 13778.

The trial judge also precluded testimony from Esther Bell that her son was a special-education student with learning disabilities who had not graduated from high school and had no police record. At a pretrial suppression hearing, she testified that petitioner had "a learning disability in mostly math and English so he was placed in Special Ed classes." Tr. 298. It is not clear from the record why this evidence was excluded at trial. Outside the presence of the jury, Justice Cooperman and the attorneys for the prosecution and the defense discussed this evidence, though only generally and in conjunction with the proffered IQ evidence, in light of the defense's failure to provide the notice required by state law.

The Supreme Court has explicitly held that a defendant does not have a constitutional right to litigate the issue of voluntariness before a jury, once a judge has found that the defendant's

statement was not the product of coercion.  <u>Lego v. Twomey</u>, 404 U.S. 477, 489-90 (1972).

Nevertheless, the Supreme Court has also observed that "evidence about the manner in which a

confession was secured will often be germane to its probative weight, a matter that is exclusively

for the jury to assess."  <u>Crane v. Kentucky</u>, 476 U.S. 683, 688 (1986).  The Supreme Court

continued:

> Confessions, even those that have been found to be voluntary, are not conclusive of
> guilt.  And, as with any other part of the prosecutor's case, a confession may be
> shown to be insufficiently corroborated or otherwise . . . unworthy of belief.  Indeed,
> stripped of the power to describe to the jury the circumstances that prompted his
> confession, the defendant is effectively disabled from answering the one question
> every rational juror needs answered: If the defendant is innocent, why did he
> previously admit his guilt?  Accordingly, regardless of whether the defendant
> marshaled the same evidence earlier in support of an unsuccessful motion to
> suppress, and entirely independent of any question of voluntariness, a defendant's
> case may stand or fall on his ability to convince the jury that the manner in which the
> confession was obtained casts doubt on its credibility.

<u>Id.</u> at 689 (internal quotation marks and citations omitted).  In that case, the Supreme Court went on

to hold that the state courts "erred in foreclosing petitioner's efforts to introduce testimony about

the environment in which the police secured his confession," especially where the "[p]etitioner's

entire defense was that there was no physical evidence to link him to the crime and that, for a variety

of reasons, his earlier admission of guilt was not to be believed."  <u>Id.</u> at 691.

In <u>Crane</u>, the defendant, who was 16 years old at the time of his arrest, sought to introduce

evidence about the length of his interrogation and the manner in which it was conducted in order to

show the jury that his confession was not credible and should be disregarded.  <u>Id.</u> at 685-86.  In the

present case, by contrast, petitioner seeks to introduce evidence regarding his background rather than

the circumstances of his interrogation.  <u>Crane</u> focused on the "physical and psychological

environment" in which the confession was obtained, a phrase Justice O'Connor used on multiple

occasions.  Id. at 684, 689.  As one Court of Appeals recognized, however, Crane did not address whether the "physical and psychological environment" encompassed only objectively verifiable factors affecting the confessor's physical and emotional state – such as the setting, duration, manner, and content of the police interrogation – or whether it also included "the psychological makeup of the confessor."  United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001).

While I believe that it is an unreasonable application of Crane to exclude evidence of the psychological makeup of a defendant whose confession has been admitted in evidence, the offer of proof made by petitioner did not provide a significant predicate for concluding that the evidence was related to the likelihood that petitioner would confess falsely to a crime that he did not commit. Instead, as I have previously observed, the essay comprising the offer of proof suggests that "juveniles, people with mental impairments and those who are unusually trusting of authority," are especially vulnerable to interrogation techniques used by law enforcement officers to obtain a confession.  Affirmation for Motion In Limine at 6.  The evidence proffered by Esther Bell and Marni Cohen did not place petitioner squarely in any of these categories.  Indeed, as I already observed, petitioner acknowledged that his proffered expert would not testify that petitioner "possessed characteristics that made it more likely he would confess falsely to the police."  Mem. of Law in Supp. of Motion In Limine at 7 n.2.

Moreover, the likelihood that proffered evidence would have led the jury to discredit petitioner's confession, as I said earlier, is nil.  In cases in which a videotaped confession is offered, corroborated as it was in this case, the only hope of discrediting the confession is testimony by the defendant denying the truth of the confession and explaining why he confessed falsely (or offering compelling evidence that the confession was false, such as an airtight alibi).  The testimony of

petitioner's mother, in isolation, that he was in special education because of difficulty he had in math and English, did not graduate from high school, and had no criminal record (though he actually had once been arrested for robbery, Tr. 12895), simply does not do it. The same is true with respect to the testimony regarding petitioner's IQ.

(iii) <u>The Cross-Examination of Detective Pia</u>

Detective Pia testified as to the facts and circumstances of Bell's confession, and Bell's written confession was read into evidence. ADA Reese later testified as to the circumstances of Bell's videotaped confession, and the videotape was played in open court. The defense cross-examined Detective Pia at considerable length. The trial judge sustained objections to questions about how many times Detective Pia had previously testified in court; how many suspects he had previously interrogated; what he knew about the facts of the case before he interrogated Bell; and whether Detective Sica, who was present for the interrogation, spoke to Bell prior to his interrogation when he and Detective Pia first encountered him hand-cuffed to a chair outside Lieutenant Nevins's office. Tr. 11863. Later in the cross-examination, Detective Pia denied supplying Bell with the details contained in his statement to the police, confessing that he had committed the murders.

The defense's cross-examination of Detective Pia regarding how many times he had testified and how many suspects he had interrogated was only marginally relevant to the proceedings. There was testimony, as petitioner's counsel observed in his summation, that Detectives Pia and Sica were assigned to interrogate Bell "because they were very experienced detectives in getting suspects to make statements." Tr. 13053 (quoting from the testimony of the Lieutenant Nevins, Tr. 11742, who assigned them to question Bell). Moreover, while a question relating to Detective Pia's prior

knowledge of the details of the crime (to which an objection was sustained) was relevant to an argument that he had provided those details to the petitioner, common sense would suggest that Detective Pia would not have been assigned to the interrogation without such knowledge. As petitioner's counsel told the jury, some of the details "could have been fed to George by the police who obviously had details." Tr. 11000. Indeed, Detective Pia testified that, when petitioner initially said that he used a silver .380 automatic weapon, Tr. 11798, "[o]ne of the things I had going into talking to Mr. Bell, was the fact that I knew that all the ballistics evidence was of a 9 mm caliber," Tr. 11799, which apparently caused petitioner to correct his confession. Tr. 11800.

Moreover, Detective Pia expressly testified that, aside from his knowledge of the ballistics evidence, he had previously perused a copy of Bigweh's confession implicating petitioner, Tr. 11852, and he had also obtained other information from Detective Sica. Tr. 11859. While Detective Sica was not called as a witness at trial, he testified at the suppression hearing that, when he had arrived at the precinct, a Captain McCarthy got him "up to speed on what was happening with the case" and that he was provided with and read Bigweh's statement. Tr. 319. Because Bigweh's statement, as summarized at the suppression hearing, Tr. 19-20, differed from petitioner's confession, Pia's knowledge of its contents would not have supported the argument that he fed the details of Bigweh's statement to petitioner.

The foregoing discussion sufficiently addresses the prejudice relating to the ruling limiting the cross examination of Detective Pia. I add these brief words regarding petitioner's confession. My reading of the record indicates that petitioner was able to cross-examine Detective Pia extensively and effectively regarding the events surrounding petitioner's statement to the police and that petitioner was able to mount a substantial challenge to the reliability of his confession. Indeed,

as the District Attorney observes, there was ample evidence from which "the defense was able to argue at length that there were errors in petitioner's statement that cast doubt on its validity." Letter of Linda Cantoni, Assistant District Attorney (Oct. 30, 2007) at 12 (citing parts of the confession that were shown to be inconsistent with the evidence). And, at one point in the course of the videotaped confession, petitioner said "in a whisper 'being framed.'" Tr. 11993. Nevertheless, the problem petitioner faced, and which he could not overcome without testifying, was the other evidence corroborating his guilt.

(iv) Collier's Testimony

Mendez Collier, it will be recalled, was one of those arrested along with the petitioner, on December 24, 1996. Collier was called as a defense witness. While the trial judge permitted Collier to testify that he saw petitioner handcuffed, that he appeared sad, and that he was crying, he sustained an objection to a question of whether Collier heard a police officer say anything to petitioner when he saw him at the precinct. Tr. 12473. Subsequently, on redirect, an objection was sustained to the question of whether, while he was at the precinct, Collier "hear[d] any police officer yell out or threaten George." Tr. 12493. Then, in a motion to reopen the examination of Collier, petitioner's counsel advised the judge that Collier would have testified that he observed "the shouting at Mr. Bell in a threatening manner and not permitting Mr. Bell to speak [to him]." Tr. 12501. Nevertheless, it is clear from the record that this incident – assuming it occurred – must have taken place prior to 4:30 a.m., when petitioner's interrogation began. Bell and Collier were questioned in different rooms. Tr. 12469, 12471-73. Nor was it clear from the question or the offer of proof when, in relation to the time petitioner confessed, Collier made the observation at issue, or which police officer was shouting.

The trial judge erred in sustaining this objection, although the error is not sufficient to warrant relief. Detective Pia testified that during the questioning, Bell was "nervous and fidgety," and that he later cried for a very brief period of time. Tr. 11860. In light of this testimony and Collier's testimony regarding his observations of petitioner, and the fact that Collier was yelled at and threatened and that the police unsuccessfully sought to have him confess, evidence conforming to the offer of proof would not likely have affected the verdict. Again, as a practical matter, it is virtually impossible for a defendant to succeed in persuading a jury that his confession, corroborated by an eyewitness identification, the confession of an accomplice, and by other circumstantial evidence, was untrue without taking the stand and explaining why he confessed. Significantly, during its deliberations, the jury asked for the videotape of the confession, Tr. 13365, the eyewitness testimony, Tr. 13397, and the telephone logs of the calls Gary Johnson made to petitioner's telephone a little more than an hour before the attempted robbery and double homicide. Id.

(v) Evidentiary Rulings Related to Jason

Based in part on the statements of Bell, Bigweh, and Johnson that a person named "Jason" was the getaway driver, Jason Ligon was arrested on May 30, 1997, more than five months after Bell's arrest. (Jason Ligon is the son of Bertha Ligon, the witness discussed above who later testified for the defense at Bell's trial.) Ligon confessed to Detective Bovino and Detective Maryann Bubelnick that he was the getaway driver. Detectives Pia and Sica, who took Bell's statement, were not involved in taking Ligon's statement. Ligon was indicted in June, 1997 for second-degree felony murder, pursuant to Queens County Indictment No. 1893/97.

Sometime before January 1999, Ligon recanted his statement and said that he was not present at the crime scene. In October 1999, several months after Bell's trial, Assistant District Attorney

Brad A. Leventhal interviewed Bigweh for the first time. At that time, Bigweh said that Jason Ligon was not the driver. After an investigation, the District Attorney's Office concluded in May 2000 that the case against Ligon should not proceed. ADA Leventhal then interviewed Ligon, who said that he had falsely confessed in the hope of obtaining a benefit in connection with federal drug charges pending against him in the District of Columbia. He said that he thought he would be treated as a cooperating witness, not as a murder defendant, and that he had learned details of the crime from his mother, other sources in the neighborhood, and the police. On June 15, 2000, the indictment against Ligon was dismissed.

On direct examination, as previously noted, Lieutenant Nevins testified that after he spoke to Bigweh, he assembled a team to visit the homes of Bell, Johnson, Bolt, and "Jason." On cross-examination, Lieutenant Nevins was shown a "tactical plan," Def. Ex. F, which contained the names and addresses of persons to be arrested on that date. The plan indicated that one of the names was "Jason," who (at that point) had been implicated by Bigweh, that this person lived on 105th Street between 32nd Avenue and Astoria Boulevard, and that he did not know this person's full name. The trial judge, however, sustained objections to questions asking whether Lieutenant Nevins, ever arrested a person named Jason at this address, Tr. 11719-20, and whether he had a description of what "Jason" looked like. Tr. 11720.

Petitioner argues that

[e]vidence regarding an additional suspect, who may have been released, is highly relevant because it may show that the police investigation was sloppy or that the State's witnesses are unreliable. Moreover, if Jason had no connection to the case, then it raised doubts about the reliability of both Bigweh's tip and Mr. Bell's statements to the police.

Mem. of Law in Supp. of Pet. for a Writ of Habeas Corpus at 35. This argument is problematic for a number of reasons. Petitioner never apprised the trial judge that this was the purpose of the two questions that were posed to Nevins, nor was the relevance of the questions obvious. See Jones v. Berry, 880 F.2d 670, 673 (2d Cir. 1989) ("[A] party whose prospective questioning is threatened with curtailment should make all reasonable efforts to alert the court to the relevance and importance of the proposed questions.")[4]. Moreover, the answers to those two questions would have hardly established that the investigation was sloppy or that the prosecution witnesses were unreliable. Whether Nevins ever arrested Jason, by itself proves nothing. The same is true with respect to whether Nevins had a description of Jason on the date on which petitioner and his accomplices were arrested. Moreover, the jury heard testimony that, when the charges were filed against petitioner and his co-defendants on December 26, 1996, a little more than a day after their arrest, Jason was not one of those charged, Tr. 11996-97, a fact from which it could have concluded that Jason's role in the case may not have been that which petitioner or Bigweh attributed to him.

These considerations aside, "[m]erely showing that an investigation is sloppy does not establish relevance." United States v. Patrick, 248 F.3d 11, 22 (1st Cir. 2001), cert. denied, 535 U.S. 910 (2002). Rather, the "sloppy investigation" evidence must be related to a specific issue in the case. Id. at 22-23. The evidence relating to the investigation of "Jason" was not relevant to any issue in petitioner's trial. Moreover, "[s]uch speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to

---

[4] Although the Second Circuit doubted there could be error where counsel fails to make a record, it presumed the limitation on cross was erroneous because the Appellate Division had rejected the appeal on harmless error grounds. See id. at 674.

accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value."  Id. at 23.

3. Evidentiary Rulings Regarding Reginald Gousse

a. Gousse's Potential Sentence

Gousse, the jailhouse informant, testified that Bell admitted to the robbery and murders. Gousse said that Bell made threats against ADAs Reese, Morse and Dorfman, and that after hearing these threats, he contacted Assistant District Attorney Lasak in September 1998.  He testified that, at that time, he had not received any promises, but that by contacting the District Attorney's Office, he hoped to obtain leniency in connection with his pending charges.  Gousse further testified that he entered into a formal cooperation agreement with prosecutors in February 1999.  Pursuant to the agreement, he pled guilty to the charges pending against him.  Gousse expected that, as a result of his cooperation, his sentence would be reduced from twenty-one years to five years in prison.  The cooperation agreement was entered into evidence during the prosecution's redirect examination.

During cross-examination, the trial judge sustained objections to questions asking whether Gousse knew that, based on his prior felonies, he had achieved persistent-felon status, that he could be sentenced to life in prison on account of the charges pending against him, and that he faced twenty-five years in prison on each of three separate charges in the indictment.  Pursuant to the cooperation agreement, Gousse would receive a five-year sentence if he testified truthfully and a twenty-one-year sentence if he did not.  Under cross-examination, Gousse testified that he believed that, had he not pled guilty and instead gone to trial, he could have been sentenced to fifteen to twenty years in prison.  Petitioner argues that this testimony was "false" because petitioner "was eligible for lifetime imprisonment, as either a discretionary persistent or persistent violent felony

offender," Mem. of Law in Supp. of Pet. for a Writ of Habeas Corpus at 40-41, and that "[d]espite counsel's objections, the court [ ] refused to correct Gousse's false testimony that, if he had not cooperated and been convicted of pending charges, he could have received fifteen to twenty years' imprisonment. (Tr. 12179, 12203-5)." Id. at 40.

The record, however, does not indicate that the trial judge was asked to correct this testimony. Instead, the argument focused on questions petitioner should have been permitted to ask on this issue. Tr. 12204. Moreover, Gousse's testimony can hardly be characterized as false. When the issue was addressed in a colloquy after Gousse testified, an argument ensued as to whether a Youthful Offender conviction in Florida, which presumably triggered the sentence petitioner's argument suggested, actually had this effect. Petitioner cited a case that held that it did, People v. Kuey, 83 N.Y. 2d 278 (1994), contrary to the argument that the District Attorney continues to press here. Gousse, however, was not a lawyer, and there is simply no basis to argue that his testimony as to the sentence he believed he could receive was false, as opposed to possibly being inaccurate. In any event, the issue germane to Gousse's credibility was his perception of the sentence he would have received. On this score, it is beyond dispute that Gousse received a substantial benefit for his cooperation, pursuant to an agreement defense counsel characterized in his summation as "the deal of the century," Tr. 13045, and the jury was able to evaluate his credibility in light of that fact and other factors that went to the issue of his credibility.

b. Bell's Court Papers and Newspaper Clippings

After Gousse denied having access to Bell's court papers and press accounts of the crime during cross-examination, the trial court precluded the defense from introducing evidence that petitioner possessed those materials at Rikers Island. Tr. 12743. The trial judge also sustained

objections to some, but not all, defense questions regarding Gousse's familiarity with press accounts. Specifically, the trial judge sustained objections to questions in which Gousse was asked whether petitioner possessed a file of court papers and newspaper clippings at Rikers Island. Petitioner alleges that the evidence he was seeking to elicit was relevant to his argument that Gousse fabricated the details of petitioner's confession, because "Gousse's account, like that contained in the <u>Daily News</u>, got the number of shots fired wrong; Gousse described the incident as an 'ambush,' and another article used the very same term; and, he referred to Mr. Bell in the same formal way as the court papers – 'George Davis Bell.' (12092-93, 12183-85, 12210-14)." Mem. of Law in Supp. of Pet. for a Writ of Habeas Corpus at 40.

The district attorney argues that petitioner was permitted to ask Gousse if he had access to the papers and clippings and that petitioner was "bound by that answer." Mem. of Law in Opp. to Pet. for a Writ of Habeas Corpus at 98. According to the District Attorney, petitioner was precluded from "show[ing] through extrinsic evidence that Gousse lied about petitioner being the source of his information." <u>Id.</u> at 99. This argument reflects a fundamental misunderstanding of the rule that a cross-examiner is bound by the answer of the witness inquired into to affect credibility. The rule applies only to questions suggesting generally that the witness is not credible. Thus, "[a]n inquiry on cross-examination as to an immoral or criminal act of the witness for the sole purpose of affecting his credibility is an inquiry concerning a collateral matter" that may not be challenged by the admission of extrinsic evidence. <u>Richardson on Evidence</u> § 491 (Jerome Price ed., 10th ed. 1973). On the other hand, answers to questions that have a direct bearing on an issue in the trial do not come within the rule precluding the introduction of evidence relating to collateral matters. <u>Id.</u>; <u>see also</u> <u>People v. Hudy</u>, 73 N.Y.2d 40, 56 (1988). "'Direct,' in this context, means any evidence

tending to prove the proponent's case on the merits or to disprove the opponent's, even though this 'direct' evidence, if believed, might also contradict, undermine or discredit a witness." Prince, Richardson on Evidence § 6-305 (Richard T. Farrell ed., 11th ed. 1995). The issue of whether Gousse falsely testified that petitioner confessed to him goes to the heart of the case; it is absurd to suggest that extrinsic evidence relevant to that issue is collateral.

Moreover, the collateral matter rule addresses the issue of the admission of evidence for the purpose of impeaching testimony elicited on cross-examination. If evidence is otherwise admissible, it does not fall under the scope of the rule. Prince, Richardson on Evidence § 6-305. As the New York Court of Appeals held long ago: "The relations which a witness has to the case, or to a party, threats made by him, the fact that a party tried to bribe him, the fabrication, destruction or concealment of evidence and the like, may be shown." Hoag v. Wright, 174 N.Y. 36, 45-46 (1903); see also People v. Perez, 100 A.D.2d 366, 385 (2d Dept. 1984), rev'd on other grounds, 65 N.Y.2d 154 (1985). Because the proffered evidence was relevant to the argument that Gousse fabricated his testimony regarding petitioner's confession, it was independently admissible. Prince, Richardson on Evidence § 6-305. The fact that Gousse denied fabricating the confession on cross-examination cannot prevent petitioner from offering circumstantial evidence to prove that Gousse's testimony on direct was false. On the contrary, as the New York Court of Appeals more recently observed, "the trial court's discretion in this area is circumscribed by the defendant's constitutional rights to present a defense and confront his accusers." Hudy, 73 N.Y.2d at 57 (citations omitted).

While the ruling precluding the evidence proffered by petitioner was plainly erroneous, the evidence was a double edged sword. On one edge, it provided some circumstantial support for the argument that Gousse may have fabricated the confession from newspaper articles and court papers,

while on the other, it corroborated Gousse's testimony that he discussed the case with petitioner. Indeed, petitioner does not allege that all of the details of his statements that Gousse testified to were a matter of public record. My impression is that they were not. Thus, even if the jury concluded that Gousse had seen these articles, it would not have conclusively established that he fabricated the substance of his testimony. More significantly, given the other evidence of petitioner's guilt, I am persuaded that petitioner would have been convicted without Gousse's testimony, which was subject to a devastating attack on cross-examination based on his criminal record and the consideration he received for his testimony. Consistent with this premise, during its deliberations, the jury told the trial judge that it did not want to hear a read-back of Gousse's testimony, shortly after it was initially included on a list of evidence that the jury requested. Tr. 13406-07.

----------------------------------------------

While I have concluded that the trial judge made a number of erroneous evidentiary rulings, none of which, petitioner acknowledges, would independently warrant upsetting the conviction, there remains the argument that, taken together, these rulings deprived the defendant of a fair trial. This argument is not without some force. Nevertheless, I am unable to conclude on this record that the whole is greater than the sum of its parts. Some of the erroneous rulings were not significant in terms of their impact on the trial. Others were harmless because other evidence was admitted that made up for the evidence that was excluded, and others were ultimately overcome by the corroboration provided by the cumulative effect of other evidence in the case. Moreover, not all of the rulings were erroneous, even though I rejected petitioner's arguments on the alternative ground that the errors were harmless.

<u>4. Failure to Disclose Information Regarding Reginald Gousse</u>

As I have already observed in discussing the issues relating to evidentiary rulings made at trial with respect to Reginald Gousse, Bell was incarcerated at Rikers Island, where he came to know Gousse, another inmate, who was being held on robbery and kidnaping charges. Gousse, a Haitian national, was not a citizen of the United States and had previously been ordered deported in light of a 1992 conviction for attempted robbery in the first degree. In September 1998, Gousse contacted ADA Greg Lasak and said that Bell had confided to him that he had killed the two men at the check-cashing store. Gousse entered into a cooperation agreement, which I have already described, pursuant to which he agreed to plead guilty to the charges he was facing.

After his guilty pleas were taken, but before he was sentenced, the prosecution assisted Gousse in having his 1992 conviction vacated. In its place, he was allowed to plead guilty to a non-violent offense, criminal possession of stolen property in the third degree, in exchange for a sentence of five months. As a result, deportation proceedings stemming from his 1992 conviction were terminated. With respect to his 1999 guilty plea, Gousse was not sentenced until March 24, 2004, at which time he was released, having served his entire sentence at Rikers Island and the Westchester County jail.

Petitioner argues that he was denied due process when the prosecution (1) failed to disclose that Gousse was a foreign national who had previously been ordered deported and had a pending deportation proceeding at the time he testified; (2) failed to disclose the full extent of the benefit Gousse received in exchange for his cooperation; and (3) failed to correct Gousse's testimony that the reduced five-year prison sentence was the sole benefit he was to receive for his cooperation. In support, petitioner points to events that occurred after his trial, namely that Gousse was allowed to

serve his entire sentence at Rikers Island and in the Westchester County jail, rather than in state prison, and that the prosecutors helped him obtain vacatur of his 1992 conviction for attempted robbery in the first degree, which terminated the deportation proceedings stemming from that conviction. In response, the District Attorney contends that (1) he did not know that Gousse was a foreign national, much less that he was subject to deportation, when he testified; (2) no promises or understandings regarding immigration matters were made in exchange for Gousse's testimony; and (3) Gousse neither lied about the extent of his cooperation agreement at trial, nor did the prosecution fail to correct his misstatements.

In denying the defendant's motion to vacate the judgment, Justice Cooperman found these allegations to be "conclusory" and "unsubstantiated" and held that there was no violation of Brady or Giglio because the prosecution was not aware of Gousse's immigration status at the time of trial. People v. Bell, Ind. No. 129/97, slip op. at 6 (N.Y. Sup. Ct. May 11, 2005). Justice Cooperman observed that Gousse said he was an American citizen when he pleaded guilty, and, relying on an affidavit from ADA Leventhal, found that the prosecution first learned that Gousse was an alien and was subject to deportation in the spring of 2003, when Gousse disclosed those facts in anticipation of his sentencing. Id. at 6-7. Only then, Justice Cooperman found, did the prosecutors agree to help Gousse with his deportation problems. Id. at 7. These findings of fact are presumed correct, 28 U.S.C. § 2254(e)(1), and petitioner has offered no evidence to rebut that presumption.

Petitioner contends that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). He notes that the prosecution provided the state court with only three affidavits – those of ADA Leventhal and two other prosecutors – in support of the proposition that,

to their knowledge, no one in the District Attorney's Office was aware of Gousse's immigration status. He argues that it would be unreasonable to conclude, on the basis of those affidavits, that all of the numerous prosecutors, investigators, and correctional officers who had direct contact with Gousse prior to the trial were unaware of Gousse's situation. To that end, in his reply brief, petitioner seeks further discovery and an evidentiary hearing on this claim.

While it is true that, on the basis of the affidavits submitted to the state court, it is impossible to conclude definitively that no one affiliated with the prosecution was aware of Gousse's immigration status, Justice Cooperman's finding was not unreasonable in light of how difficult it is to prove a negative – that no one was aware of Gousse's status – and the passage of more than six years between the time Gousse first contacted the District Attorney's Office and the date on which the prosecution filed its opposition to Bell's motion to vacate the judgment. Petitioner's allegation that someone, somewhere, knew of Gousse's immigration status, does not justify a hearing.

Finally, the record before the jury was replete with information tending to undermine Gousse's credibility – his criminal record, instances of deceit, numerous disciplinary infractions while incarcerated, and a cooperation agreement that defense counsel described as "the deal of the century." Tr. 13045. Indeed, as I have already said, the attack on Gousse's credibility in the defense summation was devastating. Tr. 13039-45. Moreover, the other evidence on which the jury focused during its deliberations was compelling. Under the circumstances, there is not "a reasonable probability that . . . the result of the proceeding would have been different." <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (internal quotation marks and citations omitted).

5. Failure to Disclose Information Regarding Jason Ligon

Petitioner next argues that he was denied due process when the prosecution failed to disclose, at the time of his trial, that they knew that Jason Ligon's confession to the police was false. He contends that this information was material and exculpatory insofar as it would corroborate his claim that he was induced into falsely implicating himself. While the District Attorney knew before petitioner's trial that Ligon had recanted his statement to the police, Ligon's recantation was neither exculpatory nor impeaching. First and foremost, the fact that the police had obtained a false confession from Ligon is not exculpatory because it sheds no light on petitioner's guilt or innocence. By recanting, Ligon merely stated that he was not present during the crime; he did not say that petitioner was also not present. Moreover, Ligon provided a plausible explanation for his confession. Petitioner, however, argues that this evidence calls into question the reliability of the police investigation, and that under <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), such evidence constitutes <u>Brady</u> material.

In <u>Kyles</u>, the prosecutor did not turn over to the defense several pieces of evidence, including contemporaneous eyewitness statements taken by the police after the crime, various inconsistent statements made to the police by an informant who was never called to testify, and a computer printout of license plate numbers of cars parked at the crime scene on the night of the murder, which did not list the defendant's car. <u>Id.</u> Referring to the inconsistent statements of the police informant, the Court observed that such evidence, if disclosed, "would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well." <u>Id.</u> at 445. The Supreme Court quickly noted that the prosecution considered the informant to be "essential" to the investigation and, indeed, "made the case" against the defendant. <u>Id.</u> The inconsistencies in the

informant's statements directly exculpated the defendant because they suggested that the informant himself may have been guilty and that evidence against the defendant may have been planted. Id. at 446. The statements also could have been used to impeach the police officers who testified at trial by demonstrating that they were aware of the informant's inconsistent and self-incriminating statements. Id. at 447.

In this case, petitioner argues that the fact that Ligon's statement to the police was false corroborates his claim that he was coerced into falsely implicating himself and thereby calls into question the reliability of the police investigation. Specifically, petitioner argues that the police provided both him and Ligon with the details of the crime recounted in their statements and that, in both cases, the police used forms of coercion short of physical abuse in order to prompt him and Ligon to falsely implicate themselves. These arguments are unpersuasive for several reasons. First, petitioner confessed on December 25, 1996, while Ligon was not taken into custody until more than five months later, long after petitioner and his co-defendants were arrested and charged. Second, the means by which Detectives Bovino and Bubelnick elicited a confession from Ligon shed no light on what transpired in petitioner's interview with two different officers, Detectives Pia and Sica. Third, while petitioner claims that he was coerced into confessing, Ligon has never made such an allegation. Rather, he told ADA Leventhal that he implicated himself in hopes of being treated as a cooperating witness and receiving a benefit in a pending federal drug case. The unrelatedness of petitioner's and Ligon's confessions could not be more clear.

Moreover, while the statements of the informant in Kyles were "essential" to the prosecution's case against that defendant and the inconsistencies in those statements fundamentally undermined that case, Ligon's false confession is, at most, peripheral to the police investigation into

the murders at the check-cashing store. The decision to arrest and prosecute petitioner in no way depended on Ligon's statement, and Ligon's recantation did nothing to undermine those decisions.

Finally, Justice Cooperman found that "it is likely that defendant knew, on or about January 1999, two months prior to jury selection, that Ligon had retracted his confession." <u>People v. Bell</u>, Ind. No. 128/97, slip op. at 4 (N.Y. Sup. Ct. May 11, 2005). Specifically, Justice Cooperman observed that on January 19, 1999, fourteen months after he ruled on petitioner's original request for discovery of <u>Brady</u> and <u>Giglio</u> materials and four months prior to the start of the trial, the defense renewed its demand for "any and all exculpatory material regarding Jason Ligon . . . and . . . any evidence that Jason Ligon or any other person charged with this offense has changed or recanted any statement inculpating himself and/or George Bell." <u>Id.</u> at 5. Justice Cooperman found the logical inference of this request to be that "that defendant knew, or should have known, that Ligon had recanted." <u>Id.</u> Petitioner offers no evidence to the contrary.

In his reply brief, petitioner asks for an evidentiary hearing on his <u>Brady</u> claim, contending that in denying his motion to vacate the judgment, the trial judge made unreasonable determinations of the facts without first conducting a hearing. First, he takes issue with the finding, based upon the uncontested affidavit of ADA Leventhal, that Ligon falsely implicated himself in order to obtain a benefit in an unrelated drug case. Petitioner contends that ADA Leventhal's statement was insufficient to refute his allegation that improper police conduct caused Ligon to falsely confess. However, as there is no factual support for the contention that Ligon's statement was anything but voluntary, the trial judge's conclusion was not unreasonable.

Petitioner also takes issue with the trial judge's conclusion that the defense had notice before trial that Ligon had recanted his confession. The defense contends that this evidence is insufficient

and should be the subject of a hearing. There are two reasons why this argument is unavailing. First is the sheer magnitude of this supposed coincidence – that the defense would make an out-of-the-blue request for evidence related to Ligon's recantation only days or weeks after he had in fact recanted. Second is the fact, not mentioned by the trial court, that Ligon's mother was a defense witness.

### 6. The Prosecutor's Summation

Petitioner argues that the prosecutor's closing arguments denied him a fair trial. In particular, he cites statements allegedly disparaging the defense lawyers and their tactics, distorting defense arguments, suggesting that counsel had concocted a defense, exploiting the effect of the court's numerous preclusion orders, improperly commenting on petitioner's silence at trial, and enhancing Gousse's credibility. Some background is necessary to place this argument in context.

In his summation to the jury, the defense attorney challenged the validity of Bell's videotaped confession. He said that accepting Detective Pia's version of events at his word would, in effect, condone a "police state," and that Bell had been "terrorized." He pointed out a hockey stick in the background of Bell's videotaped confession, and said that what transpired in the interrogation room between the time Bell arrived and the time he confessed on camera was "not benign." The defense attorney twice referred to the videotaped confession as "theater," and said that Bell's statements were "coerced" and "a product of terror, not a statement of truth." (The defense also referred to Bell's statement as a "product of terror" in its opening argument to the jury.)

In his own summation, the Assistant District Attorney called the defense attorney's suggestions "vile" and "despicable," and said that they were meant to appeal to the possible

prejudice of the jurors against the New York Police Department. The defense did not object to these statements. Noting the defense attorney's emphasis on the presence of a hockey stick in the background of the videotape, the Assistant District Attorney said that there were no allegations of force and suggested that the defense intended to "hark[] you to cases which are taking place in other jurisdictions."[5] He called these tactics "sleazy," and the defense objected. The trial judge sustained the defense's objection and issued a curative instruction that such a characterization was "inappropriate." The prosecutor then said, without objection, that the defense was asking the jurors to violate their oaths by engaging in unfounded speculation as to what occurred in the station house. Later, recalling Detective Pia's testimony that he had engaged in an hour of sports-related small talk with Bell at the station house, the Assistant District Attorney said that there was no evidence that their conversation did not happen as described. The defense objected, arguing that this statement impermissibly shifted the burden to the defense, and Justice Cooperman issued a curative instruction stating that "the People have the burden of proof at all times and the defendant need do nothing." The prosecutor also said that there was "no evidence of threats, coercion, force, [or] promises," and that the jurors would violate their oaths by engaging in speculation to the contrary. The defense objected, and the trial judge overruled the objection. The prosecutor later said, with reference to Bell's videotaped confession, that Bell was not "regurgitating" a statement fed to him by Detective Pia, but was "telling you what he did and trying to put it in the best light he could." The defense did not object.

---

[5] At that time, criminal charges were pending against five New York Police Department officers for viciously beating and sodomizing Abner Louima at the 70th Precinct station house in Brooklyn. The case drew widespread media attention and would have been well known to the jurors in the Bell trial.

The defense also challenged the statements of prosecution witnesses. It contended that Turnbull falsely identified Bell because he felt pressured by the police. The defense also said that Gousse was a liar, that he had learned Bell's middle name (and by extension, details about the crime) from sources other than Bell, and that he had received "the deal of the century" from the prosecution. In response, the Assistant District Attorney said that Gousse knew Bell's middle name because Bell had used it himself at times. Later, the Assistant District Attorney said that Gousse did not, in fact, receive "the deal of the century," because as a "known informant," he would serve five years in prison "if he is fortunate enough to live that long." The judge overruled defense counsel's objection to that statement.

The Assistant District Attorney said that the defense position "boils down essentially to a frame argument, with Detective Pia being the architect and the District Attorney's Office being either the unwilling dupes, or willing participants, or I think as defense counsel characterize[s] this at one point, suckers." He then said that the alleged frame would involve Turnbull, in addition to several police officers and prosecutors. The defense did not object to this statement. The Assistant District Attorney continued that the defense attorneys devised the frame defense because they had no other option, noting that once Bell had confessed, he was left with very few choices: "Now, you can either admit the truth of the statement and plead guilty, but in the event that you don't want to do that, then you have to devise a defense." The defense objected, and the judge overruled the objection.

The Supreme Court has articulated a standard for determining when a prosecutor's misconduct at trial rises to the level of a due process violation. Under this standard, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant

question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citations omitted). This standard requires the reviewing court to consider the prosecutor's comments in the entire context of the trial. See United States v. Young, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."). In particular, reviewing courts must examine the conduct of defense attorneys to determine whether their statements invited replies from the prosecution. Id. The "invited response" or "invited reply" rule does not excuse prosecutorial misconduct, but it allows the court to determine "the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." Id. at 12. "Thus the import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." Id. at 12-13.

In this context, the statements of the Assistant District Attorney did not so infect the trial with unfairness so as to render petitioner's conviction a denial of due process. Virtually all of the statements petitioner argues were prejudicial came in response to statements by defense counsel – some of which had no support in the trial record. While the Assistant District Attorney's statements describing the defense attorney's arguments as "vile," "despicable," and "sleazy" were inappropriate, they were neither pervasive nor persistent. Moreover, when the defense later objected to the prosecutor's second use of the word "sleazy," the judge sustained the objection and issued a curative instruction, thereby mitigating any prejudice the defendant may have suffered.

Petitioner also argues that the Assistant District Attorney improperly commented on his decision not to testify in his own defense. Specifically recalling Detective Pia's testimony that he had engaged in an hour of sports-related small talk with petitioner at the station house, the Assistant District Attorney said in his summation that there was no evidence that the conversation did not happen as Detective Pia testified it did. Nevertheless, when the defense objected that this statement impermissibly shifted the burden to the defense, Justice Cooperman issued a curative instruction stating that the prosecution bore the burden of proof, and that the defendant need not do anything. That instruction was sufficient to mitigate any prejudice the defendant might have suffered as a result of the challenged statement of the Assistant District Attorney. See generally Greer v. Miller, 483 U.S. 756, 766 (1987) (due process is not violated by an improper question when it is immediately followed by an objection and a curative instruction).

### 7. Jury Charge on Reasonable Doubt

Petitioner next argues that his right to due process was violated by the trial judge's instructions to the jury on reasonable doubt, which he claims improperly shifted the burden of proof from the government to the defendant. In particular, he objects to the sections of the charge in which the judge said that a "reasonable doubt" is one which a "reasonable person" would be likely to entertain; that a reasonable doubt "must be a doubt for which some reason can be given"; and that the jurors were obliged to weigh and consider the evidence in the case before deciding whether there was a reasonable doubt as to the defendant's guilt.

This argument is without merit. A jury may be instructed that a "reasonable doubt" is one which a "reasonable person" would be likely to entertain. See 1 Leonard B. Sand et al., Modern Federal Jury Instructions § 4-2, at 4-8 (2004) ("[A reasonable doubt] is a doubt that a reasonable

person has after carefully weighing all of the evidence."). Nor is it wrong to instruct jurors to weigh the evidence before deciding whether they harbored a reasonable doubt as to the defendant's guilt. See id. ("If, after fair and impartial consideration of all of the evidence you have a reasonable doubt, it is your duty to acquit the defendant.") (emphasis added). And while the statement that a reasonable doubt is "a doubt for which a reason can be given" may be "unwise," Vargas v. Keane, 86 F.3d 1273, 1277 (2d Cir. 1996), it has not been found to be constitutionally infirm.

Finally, it is acknowledged by both parties that in assessing the validity of the judge's instructions to the jury, the charge must be read as a whole. Estelle v. McGuire, 502 U.S. 62, 72 (1991). As delivered, the judge's charge to the jury on reasonable doubt read:

> The standard of proof required by law in every criminal case is proof of guilt beyond a reasonable doubt. That standard[,] however[,] does not require that the People . . . prove a defendant guilty beyond all possibility of doubt, or beyond a shadow of a doubt. It requires the People to establish a defendant's guilt beyond a reasonable doubt.
>
> Our law[,] therefore[,] requires that before this jury may convict a defendant, each of you must be satisfied that the credible evidence is sufficient to convince you beyond a reasonable doubt[] that the defendant is in fact guilty. The evidence must satisfy you beyond a reasonable doubt that the defendant is in fact the person who committed the crimes charged. The evidence must also establish beyond a reasonable doubt each and every essential element of the crimes charged of Murder in the First Degree[,] six counts, Murder in the Second Degree, six counts, Attempted Robbery in the First Degree, Burglary in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree[, a]s I shall shortly in this charge define[] such elements.
>
> Now what does the law mean when it requires proof of guilt beyond a reasonable doubt[?] When is a doubt of guilt a reasonable doubt under our law[?]
>
> A doubt of a defendant's guilt[,] to be a reasonable doubt, must be a doubt for which some reason can be given. The doubt[,] to be reasonable[,] must therefore arise[] because of the nature and quality of the evidence in the case, or from the lack of insufficiency of the evidence in the case.

A doubt[,] to be a reasonable doubt[,] should be one which a reasonable person acting in a matter of this importance[] would be likely to entertain because of the evidence, or because of the lack or insufficiency of the evidence in the case.

A doubt of guilt is not reasonable if instead of being based upon the nature and quality of the evidence, or insufficiency of the evidence, it is based upon some guess, or whim, or speculation unrelated to the evidence in the case.

You see[,] the human mind can conceive of a doubt on almost anything. Also[,] a doubt of guilt is not a reasonable doubt if it is based merely on sympathy for a defendant or from a mere desire by a juror to avoid disagreeable duty.

I therefore repeat, a doubt of a defendant's guilt[,] to be a reasonable doubt, must arise either from the nature and quality of the evidence in the case, or from a lack or insufficiency of the evidence in the case.

Therefore, the first duty of each juror is to consider and weigh all the evidence in the case, and decide what you believe is credible and believable of your consideration.

The next duty of each juror is to determine whether the jury has in fact a reasonable doubt of a defendant's guilt[,] as that term is defined in our law.

A reasonable doubt[,] our law says[,] is an actual doubt[,] one[ ] which you are conscious of having in your mind after you have considered all the evidence in the case. If[,] after doing so[,] you then feel uncertain and not fully convinced of a defendant's guilt and you are also satisfied that in entertaining such a doubt, you are acting as a reasonable person should act in a matter of this importance, then that is a reasonable doubt of which the defendant is entitled to the benefit.

I repeat, it is the duty of each juror to carefully review, weigh and consider all the evidence in the case. If after doing so you find that the People have not proved the defendant's guilt beyond a reasonable doubt, as I have defined that term to you, then you must find the defendant not guilty.

On the other hand, if you are satisfied that the People have proved the defendant's guilt beyond a reasonable doubt, as I have defined that term to you, you must then find the defendant guilty.

A defendant is never required to prove anything. On the [contrary,] the People[,] having accused the defendant of the crimes charged[,] have the burden of proving the defendant's guilt beyond a reasonable doubt. And the People have the burden of proving the defendant's guilt beyond a reasonable doubt[] as to each and every essential element of the crimes submitted to you.

The burden never shifts. It remains on the People and the presumption of innocence remains with every defendant from the beginning of the trial[] until such time when[,] during final deliberations, the jury may be convinced that the People have proved the defendant's guilt beyond a reasonable doubt.

Therefore, if in your minds during your final deliberations the People have not borne their burden of proof, and the presumption of innocence has not been overcome by proof which convinces you beyond a reasonable doubt, then of course you must find the defendant not guilty.

If in your minds during your final deliberation you are satisfied from all the evidence that the People have borne the burden of proof, and that the presumption of innocence has been overcome by evidence which convinces you beyond a reasonable doubt, then you must of course find the defendant guilty.

Tr. 13301-06.

Later in the jury charge, in discussing each of the charges against the defendant, the judge repeatedly reiterated that the prosecution bore the burden of proving each element of each offense beyond a reasonable doubt. The judge's extensive charge on the meaning and application of reasonable doubt, read as a whole, leaves no doubt that the burden is on the prosecution to prove the defendant's guilt beyond a reasonable doubt, and that the jury can consider any perceived lack of evidence in its deliberations. See Justice v. Hoke, 45 F.3d 33, 35-36 (2d Cir. 1995).

### 8. Failure to Seek Counsel's Input Before Responding to Jury Note

The jury's deliberations commenced on June 9, 1999. On the second day of deliberations, the jury requested Turnbull's description of the clothing of the men he saw at the check-cashing store and evidence regarding the observations of the three defense eyewitnesses. The trial judge did not disclose the note to counsel until an hour after receiving it. The trial judge advised counsel that the court reporter already identified the relevant testimony "to save time." The defense said that it wanted to review the transcript to ensure full compliance with the jury's request. The judge

responded, "Next time I'll do that." The following morning, on June 11, 1999, the jury convicted Bell of all counts.

Petitioner argues that this procedure violated his right to due process. In support of this argument, petitioner relies on Rogers v. United States, 422 U.S. 35 (1975), in which the Supreme Court, relying on Federal Rule of Criminal Procedure 43, said that a defendant's attorney must be "given an opportunity to be heard" before the court responds to a jury note. Id. at 39. Rogers is not controlling here. The essence of petitioner's claim is not that the judge failed to inform defense counsel of the juror note, or that he was denied the right to be present when the judge responded to the jury's note, both of which were the case in Rogers. In fact, Justice Cooperman notified defense counsel of the existence and contents of the note in petitioner's presence, and then responded to the note, again in the presence of petitioner and his attorneys. Rather, the gravamen of petitioner's claim is that his attorneys did not have the opportunity to submit to the court those portions of the testimony they thought were responsive to the jury note or to evaluate the portions chosen by the court reporter. Justice Cooperman's decision not to seek the input of counsel in this manner may have been unwise, as he acknowledged when he agreed to obtain counsel's input before responding to future notes. Nevertheless, the trial judge's conduct was not an unreasonable application of clearly established federal law. While Rogers concerned an unusual jury note implicating important legal issues, the jury note in the present case was routine and demanded only a ministerial response. Indeed, petitioner's attorneys did not object after the readback or argue that any testimony was erroneously read back to or withheld from the jury. Nor do they point to any specific error or omission that might have prejudiced the defendant.

**Conclusion**

The petition for a writ of habeas corpus is denied. I grant petitioner a certificate of appealability with respect to the following issues: alleged juror misconduct, exclusion of evidence, evidentiary rulings regarding Reginald Gousse, failure to disclose information regarding Reginald Gousse, failure to disclose information regarding Jason Ligon, and the prosecutor's summation.

SO ORDERED.

Brooklyn, New York
June 20, 2008

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge