UNITED STATES DISTRICT COURT         <u>NOT FOR PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK
\------------------------------------------------------- X
GEORGE BELL,                        :
                                 :
               Petitioner,     :
                               :         <u>MEMORANDUM</u>
      - against -           :
                               :
ROBERT E. ERCOLE, Superintendent, Green    :      No. 05 CV 4532(ERK)
Haven Correctional Facility,              :
                               :
                 Respondent.    :
\------------------------------------------------------- X

KORMAN, District Judge.

In this case, *Bell v. Ercole*, No. 05-4532, 2008 WL 2484585 (E.D.N.Y. Jun. 20, 2008), I denied the petition for a writ of habeas corpus. The Court of Appeals for the Second Circuit remanded the case pursuant to *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994) with the direction to:

> (1) Analyze each of the challenged evidentiary rulings under the analytical framework set forth in *Hawkins v. Costello*, 460 F.3d 238, 242-44 (2d Cir.2006);
> (2) Discuss more thoroughly whether the collective impact of the challenged evidentiary rulings considered together with the prosecutor's summation warrants habeas relief; and
> (3) Clarify the evidentiary basis for the "confession of an accomplice" it referenced, *e.g.,* 2008 WL 2484585, at *11, *18, as well as the weight this "confession" received in its harmless error analysis.

*Bell v. Ercole,* No. 08-3539, 2010 WL 726023, at *4 (2d Cir. Mar. 4, 2010).

## OVERVIEW

In *Hawkins v. Costello*, the Second Circuit held that, "[i]n considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, we start with the propriety of the trial court's evidentiary ruling." *Hawkins*, 460 F.3d at 244 (quotations omitted). While *Hawkins* acknowledged that "habeas corpus relief does not lie for

1

errors of state law," *id.* at 244 (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)), including erroneous evidentiary rulings, it held that inquiry into "possible state evidentiary law errors at the trial level assists us in ascertaining whether the appellate division acted within the limits of what is objectively reasonable." *Hawkins*, 460 F.3d at 244 (quotations omitted).  Moreover, "[i]f potentially exculpatory evidence was erroneously excluded, we must look to 'whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Hawkins*, 460 F.3d at 244 (quoting *Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir. 1996)).  On the other hand, if the evidentiary ruling was correct, "[w]e consider whether the evidentiary ruling was arbitrary or disproportionate to the purposes [it is] designed to serve." *Hawkins*, 460 F.3d at 244 (citations omitted).  Finally, *Hawkins* observed that, "even before AEDPA required a more deferential review, the Supreme Court had a 'traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts.'" *Hawkins*, 460 F.3d at 244 (quoting *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)).  Indeed, the Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Hawkins*, 460 F.3d at 244 (citing *Crane*, 476 U.S. at 690).

Unlike *Hawkins*, which involved the application of a hearsay rule, the present case does not involve the application of a clear rule of law.  Instead, the eleven evidentiary rulings challenged turn largely on a broad discretionary rule that depends on an evaluation of whether the exclusion of evidence of varying degrees of relevance constituted an abuse of discretion on the grounds that its probative value was outweighed by its prejudicial effect—to use a short hand for the various considerations that are encompassed within the term prejudicial effect, such as

2

"its potential to mislead or distract the jury." *Watson v. Greene*, 640 F.3d 501, 511 (2d Cir. 2011).

> Abuse of discretion has been defined variously as "exceeding the bounds of reason or disregard of the rules of principles of law or practice," a decision "no reasonable person" could reach or one that leaves the appellate court with a "definite and firm conviction that the district court committed a clear error of judgment." This most lenient oversight is applied to decisions to admit or exclude evidence . . . .

7 WAYNE LAFAVE ET AL., CRIMINAL PROCEDURE, § 27.5(e) (3d ed. 2007) (citing cases). Indeed, one of the rulings at issue here involves the exclusion of expert testimony of the kind which the Second Circuit has held "rests soundly within the discretion of the trial court and shall be sustained unless manifestly erroneous." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quotations omitted).

Judge Lynch, writing for the panel in *Watson*, explained that in such a case, "the question we must answer to determine if [petitioner] is entitled to habeas relief is not simply whether the trial court abused its discretion." *Watson v. Greene*, 640 F.3d at 508. Rather, the question is "whether the determination of the [state appellate court] that there was no abuse of discretion was an 'unreasonable application of . . . clearly established Federal law.'" *Id.* (citing *Renico v. Lett*, __ U.S. __, 130 S.Ct. 1855, 1862 (2010) (internal quotations omitted)). Moreover, "[w]here state court decisions are guided only by general constitutional standards (as opposed to specific, bright-line rules), the 'unreasonable application' standard is particularly difficult to meet, because such decisions are given a particularly generous benefit of the doubt." *Watson v. Greene*, 640 F.3d 501, 508 (2d Cir. 2011).

Indeed, in *Watson*, there was a strong suggestion that the trial judge "excluded evidence based on a finding that the cross-examination on the basis of the [evidence at issue] was entirely without probative value." *Id.* at 511. While the panel in *Watson* was not persuaded that this was

the case, Judge Lynch again observed that, "[b]ecause courts have 'considerable leeway' to balance [various] factors in evidentiary decisions, *see Gueits v. Kirkpatrick,* 612 F.3d 118, 127 (2d Cir. 2010), and because 'the type of evidentiary ruling challenged in this case is afforded wide latitude by the Constitution,'" *Watson*, 640 F.3d at 512 (quoting *Wade v. Mantello,* 333 F.3d 51, 60 (2d Cir. 2003)), the issue is not "whether we would have pursued the same course" as the trial judge.  *Watson*, 640 F.3d at 512.  Instead, "[c]ombining the standard for restricting cross-examination with the AEDPA standard, in order to grant [a petitioner's] habeas petition we would have to conclude not only that the trial court abused its broad discretion by precluding cross-examination . . . about the [the evidence at issue], but also that the Appellate Division could not reasonably have determined that the [evidence] would have been excludable had the trial court properly applied standard rules of evidence' concerning admissibility."  *Watson*, 640 F.3d at 510.  Stated another way, in order to grant relief, a habeas court would have to find that the

> trial court so clearly abused its discretion that the state appellate court's failure to find an abuse of discretion was an unreasonable application of clearly established federal law.  *See Cruz v. Miller,* 255 F.3d 77, 86 (2d Cir.2001) ("[I]n making the 'reasonable application' determination, [federal courts] look to the result of a state court's consideration of a criminal defendant's claim . . . .  [D]eficient reasoning will not preclude AEDPA deference, . . . at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated.").

*Watson v. Greene*, 640 F.3d 501, 512 (2d Cir. 2011).  *See also Harrington v. Richter,* __ U.S.__, 131 S.Ct. 770, 784 (2011).

This standard is particularly pertinent because "Supreme Court precedent interpreting the Confrontation Clause establishes only general rules that give trial judges 'wide latitude' to restrict cross-examination . . . subject only to the equally general requirement that the defense be given a 'meaningful opportunity' to test the credibility of prosecution witnesses."  *Watson,* 640

4

F.3d at 509 (citations omitted).  A similar standard applies to the exclusion of evidence, which is rooted, in part, in the Confrontation Clause of the Sixth Amendment and guarantees criminal defendants "a meaningful opportunity to present a complete defense."  *Crane v. Kentucky,* 476 U.S. 683, 690 (1986).   Again, as *Hawkins* itself observed, the Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted."  *Hawkins*, 460 F.3d at 244 (citing *Crane*, 476 U.S. at 690); *see also Williams v. Lord*, 996 F.2d 1481, 1483-84 (2d Cir. 1993).

Against this backdrop, I turn to the evidentiary rulings the Court of Appeals asked me to reexamine in light of *Hawkins*.  Bell divided these rulings into three categories.  At the end of my discussion of the evidentiary issues in my original opinion, I observed that, while the trial judge made a number of evidentiary rulings, none of which, as Bell acknowledged in his Appellate Division brief and his original habeas petition, independently warrant upsetting his conviction, there remains the argument that, taken together, these rulings deprived the defendant of a fair trial.  While I acknowledged that this argument was not without some force, I ultimately rejected it because: (1) some of the erroneous rulings were not significant in terms of their impact on the trial; (2) others were harmless because other evidence was admitted that made up for the evidence that was excluded; (3) others were ultimately overcome by the corroboration provided by the cumulative effect of other evidence in the case; and (4) not all of the rulings were erroneous, even though I rejected Bell's arguments on the alternative ground that the errors were harmless.  In its order of remand, the Court of Appeals said that it was unable to analyze this conclusion "because of the vagueness of its *reasoning*."  *Bell v. Ercole,* No. 08-3539, 2010 WL

726023, at *3 (2d Cir. Mar. 4, 2010) (emphasis added).  My reasoning failed to specify which of the self-identified classes each ruling fell into.

I address both shortcomings in Part I of this Memorandum first by setting forth in each case my analysis as it appears in the original opinion.  I then apply the *Hawkins* analysis. Finally, I turn to the Court of Appeals' second question by answering whether inappropriate statements in the prosecutor's summation considered together with erroneous evidentiary rulings warrants relief.

Before doing so, I add this brief observation with respect to the language in the Second Circuit's order of remand construing *Hawkins* as requiring that a district court "must first start with the propriety of the [state] trial court's evidentiary ruling."  *Bell*, 2010 WL 726023, at *2 (internal quotations and citations omitted).  This language appears to preclude a decision that an evidentiary ruling was harmless without reaching the issue of whether it was erroneous.  Such an approach seems to me to be inconsistent with Supreme Court cases that have concluded that an evidentiary ruling was harmless without first addressing the issue of whether it was erroneous. *See, e.g., Milton v. Wainwright*, 407 U.S. 371, 377-78 (1972) (holding harmless the admission of defendant's confession, assuming *arguendo,* that it had been in violation of the Sixth Amendment); *United States v. Leon*, 468 U.S. 897, 906-07 (1984) (determining that it is possible to find the good-faith exception to the exclusionary rule was applicable without determining whether a Fourth Amendment violation had taken place); *cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling prior precedent and holding that the qualified immunity defense could be decided without first determining whether the Constitution had been violated).

The only reason I make this observation is that the nature of the alleged errors in this case largely involve the application of an abuse of discretion standard that does not always lend itself

6

to easy resolution under the deferential AEDPA standard, particularly where the applicable test is whether, "[c]ombining the standard for restricting cross-examination with the AEDPA standard, in order to grant [the petition] we would have to conclude not only that the trial court abused its broad discretion by precluding cross-examination . . . about the [the evidence at issue], but also that the Appellate Division could not reasonably have determined that the [evidence] would have been excludable had the trial court properly applied standard rules of evidence concerning admissibility." *Watson*, 640 F.3d at 510.   Under these circumstances, when harmless error exists, it is often easier to decide the case on this basis.   The Second Circuit's view that the issue of error always has to be reached at the threshold, which I follow here, is based on the assumption that a ruling excluding evidence is analogous to the failure to disclose *Brady* material.   Under *Brady*, the failure to disclose information helpful to the defense does not violate the Constitution unless that information was so material that it would have affected the verdict. As the Supreme Court has explained, "once a reviewing court applying [*Brady*] has found constitutional error there is no need for further harmless-error review." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).   This does not apply to errors of the kind alleged here.   Indeed, the Supreme Court explicitly held that the harmless error rule, as applied in habeas corpus cases, *see Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993), applies to cases involving the exclusion of evidence offered by the defendant.   *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); s*ee also United States v. Bagley*, 473 U.S. 667, 682 (1983) (applying a *Brecht*-like standard for determining materiality of undisclosed evidence helpful to the defense).

## I

1.  Challenges to the Identification

In the first category of evidentiary rulings, Bell takes exception to decisions that limited his ability to challenge Turnbull's eyewitness identification, specifically the court's rulings precluding (1) cross-examination of Detectives Bovino and Lieutenant Nevins, and testimony from Bell's mother and Collier, regarding the existence of posters offering a reward for information related to the shooting; (2) cross-examination of Assistant District Attorney Morse regarding how many lineups he had attended in his career; how many lineups he attended on December 26, 1996; and how many lineups he had attended since December 26, 1999; (3) testimony from Bell's mother that she saw her son at home, in bed, about an hour after the shootings; and (4) the admission of Bertha Ligon's 911 call after she had already testified as to its contents.

<u>The Reward Posters: Excerpt from Original Memorandum & Opinion</u>

On cross-examination, Turnbull denied learning that one of the victims of the shooting was a police officer prior to viewing the lineup.  He also denied knowing that a $10,000 reward had been offered for information leading to the arrest and conviction of those responsible for the murders and said that he did not expect to receive such a reward.  Tr. 11469-70.  The trial judge sustained objections to questions from the defense as to whether Turnbull had seen any billboards or posters bearing the phrase "Cop Shot" and offering a reward for information about this crime.  Later, the trial judge sustained objections to questions about the reward-offer during the defense's cross-examination of Detective Bovino and Lieutenant Nevins.  Also precluded was testimony from Collier and Esther Bell that they had seen reward posters, and that one such poster was affixed to the door of the restaurant where Turnbull worked two days after the crime and three days before he identified Bell in the police lineup.  Bell's counsel was permitted to ask whether Turnbull expected "to receive any reward money in the event that Mr. Bell is convicted

of this crime," Tr. 11470, and Turnbull responded that he did not know "until right this moment" that there was any reward. *Id.* Bell does not allege that Turnbull sought or received a reward.

The evidence that there were reward posters in the area, which Bell was precluded from introducing, provided relevant circumstantial evidence tending to contradict Turnbull's testimony on an issue relating to his motive to testify falsely. Bell's counsel should have been permitted to ask Turnbull if he had seen the reward posters and to offer evidence that they were in the area where Turnbull could likely have seen them. Indeed, the New York Court of Appeals has held expressly that "extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground." *People v. Hudy*, 73 N.Y.2d 40, 56 (1988).

Nevertheless, my reading of the record persuades me that the preclusion of this evidence did not affect the outcome of the trial. First, the attack on Turnbull's identification focused largely on the accuracy of his identification, rather than his motive to testify falsely. Moreover, his testimony regarding the circumstances of the identification at the lineup indicated that he did not readily identify Bell in the manner that one would expect from a witness falsely identifying someone to obtain a reward. Tr. 11462-66. Turnbull did not initially identify Bell when he first saw the participants in the lineup in a sitting position. Instead, he asked if they could stand. After looking at each of them carefully and asking that they turn left and right, he still did not make an identification. Instead, he asked that the participants holding numbers two and six stand, because they were of the same complexion. Only after they sat down did Turnbull identify Bell.

Indeed, in his summation, the prosecutor highlighted various aspects of Turnbull's conduct that indicated he was a reluctant witness, and the prosecutor offered the following explanation:

9

> Now, was his reluctance understandable to be involved?  Well, I ask you to place yourselves in a similar position.  Think of how you felt when you received the summons for jury duty, okay.  A little of reluctance, okay.  Then you came to Court the first thing you heard from the Judge, the trial could be three or four months.  My God, do you think your reluctance grew a little bit.  Then you hear it's a Capital Case.  How did you feel then a little reluctance?  How about your fellow jurors, most of them are gone.  Do you think they felt reluctant?

Tr. 13125.

This consideration aside, the eyewitness identification and Bell's confession provided corroboration for each other.  Simply stated, it was unlikely that the jury would discredit Turnbull's identification as a lie in order to obtain a reward, when the person he selected had previously confessed and had been implicated in a confession of an accomplice.

### i.   Response to the Order of Remand: Question 1

The exclusion of the reward evidence was an abuse of discretion under New York law. Moreover, under the subsequently prescribed standard in *Watson v. Greene*, the "Appellate Division could not reasonably have determined that the [evidence] would have been excludable had the trial court properly applied standard rules of evidence concerning admissibility." *Watson*, 640 F.3d at 510.  Nevertheless, I held that the exclusion of this evidence did not affect the outcome of the trial, or to use the standard in *Hawkins*, it would not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.  In sum, my rejection of petitioner's argument here was based on my conclusion that this evidence did not have significant impact on the trial because the attack on Turnbull's identification was correctly based on its lack of reliability rather than on Turnbull's credibility, and because of the other evidence linking Bell to the crime to which he confessed.[1]

---

[1]  Bell argues that the focus on the accuracy of Turnbull's identification "was entirely the result of the trial court's erroneous preclusion [of the reward evidence]."  Pet.'s Mem Law 72 n.12,

I add one brief clarification with respect to the harmless error analysis.  Specifically, I observed that "the eyewitness identification and Bell's confession provided corroboration for each other.  Simply stated, it was unlikely that the jury would discredit Turnbull's identification as a lie in order to obtain a reward, when the person he selected had previously confessed and had been implicated in a confession of an accomplice."  I make clear in my discussion of the third question posed by the Court of Appeals that when I refer to the "confession of an accomplice," I do not regard the confession of the accomplice (Bigweh) in isolation.  Indeed, as I explain below, it had to be viewed in the context of the fact that Bigweh not only implicated Bell, but also lead the police to Bell's apartment, Bigweh had a sufficiently close relationship with Bell and Johnson (whom Bell later implicated in his confession) to persuade the two of them to come out onto the street where they were arrested.  Moreover, Bell's apartment was in the same neighborhood as the scene of the crime and telephone records established that a little over an hour before the crime, Johnson called Bell's house and had two short conversations.  The significance of this was not lost on the jury, which during its deliberations requested the telephone records along with Bell's confession and the testimony of Turnbull.

In essence, the jury was intuitively performing an analysis of the evidence that provides assurance regarding the accuracy of identity in criminal cases.  As one commentator observed in a perceptive analysis of the issue:

> At root, the accuracy of the determination of identity in criminal cases depends on redundance.  In most cases in which the identity of the criminal is in dispute there are multiple, independent sources of information pointing to a single suspect.  Errors can occur in such cases . . . but they are rare.  When the identification depends on a single type of evidence, however, mistakes are much more likely.

---

ECF No. 37.  The credibility of this *ex-post facto* explanation is undermined by the opening statement of Bell's counsel that assumed the admissibility of the reward evidence and argued that it was relevant for reasons unrelated to any motive of Turnbull to lie.  Tr. 10983-84.  The focus of his argument on Turnbull was that the identification was unreliable.  Tr. 11006-07.

> The redundance that counts is not between one eyewitness and another but between different types of evidence of identity.

Samuel R. Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt*, 16 J. LEGAL STUD. 395, 432-33 (1987).

> ii.    Response to the Order of Remand: Question 2

Bell argues that the summation of the prosecutor exploited the harmfulness of the trial court's error in refusing to allow evidence of the reward posters. Specifically, the prosecutor argued that there was no reason to disbelieve Turnbull's testimony and that Turnbull had nothing to gain by testifying against Bell. Tr. 13133-34. There is no allegation that this statement was untrue. Indeed, since Turnbull never sought a reward, the evidentiary ruling at issue would not be an issue in a retrial some eleven years later. Moreover, the evidence at trial established that Turnbull had not sought any reward by the time of the trial more than two and a half years later. He had hesitated in making the identification at the lineup and he appeared to be a reluctant witness. Indeed, in explaining an inconsistency in an earlier statement he made to the police, Turnbull stated, "they kept promising that I would go home and they kept telling me that you can go after this. This will be the last thing and I was [aggravated] and tired and I wanted to go so I told them anything." Tr. 13031.

More significantly, Bell's counsel did not argue in summation that Turnbull had a motive to lie. On the contrary, he argued that Turnbull felt pressured while in police custody to make an identification. Tr. 13032 (citing Tr. 11478). Significantly, even in his opening statement, Bell's counsel argued only that Turnbull's identification was inherently unreliable. Tr. 11006-07. While he assumed that the reward money evidence would be admitted, he referred to it only to argue that this was evidence of the overly aggressive nature of the investigation that resulted from the fact that one of the murder victims was an off-duty New York City police officer. Tr.

10983-84 ("For [the] nature and the climate of the investigation changed because of who got lost, because the loss of a police officer.  That is simply a fact.").

Thus, the prosecutor's comments in summation merely set up a straw man, which was easy to knock down, but did not prejudice Bell any more than the trial court's ruling already had. Finally, while it may appear unseemly for a prosecutor to form arguments around the absence of evidence to which he successfully objected, unseemliness is not a basis for a federal court to upset a state court conviction where the comment was harmless.  Indeed, even on a direct appeal from judgment of conviction, where the prosecutor concededly gave an improper summation of the kind that prosecutors had been repeatedly warned not to make, the Supreme Court held that a reversal of conviction was inappropriate because the error was harmless.  *United States v. Hasting*, 461 U.S. 499, 507 (1988) (observing that "the interest preserved by the doctrine of harmless error cannot be so lightly and casually ignored in order to chastise what the court viewed as prosecutorial overreaching.").

<u>The Cross-Examination of ADA Morse: Excerpt from Original Memorandum & Opinion</u>

Turnbull also testified about the circumstances and conduct of the lineup, as did Detective Bovino.  Both said that Turnbull asked Detective Bovino if Nos. 2 and 6—a filler and Bell, respectively—could stand up.  Both also said that Detective Bovino asked Nos. 2 and 6 to stand up and that, in fact, both did so.  In response, two of Bell's former defense lawyers, both of whom attended the lineup, testified that Detective Bovino asked only No. 6 to stand up.  Both attorneys were cross-examined as to their ability to recollect details of the lineup.  The District Attorney later called ADA Morse as a rebuttal witness, and he testified that Nos. 2 and 6 were asked to stand and turn at the same time and that they did so.  On cross-examination, the defense asked ADA Morse how many lineups he had attended in his career, how many lineups he

13

attended on December 26, 1996, and how many lineups he had attended since December 26, 1999.  The trial judge sustained objections to each of those questions.  At sidebar, the defense said that it wanted to elicit the fact that ADA Morse had attended approximately 350 lineups in his career, including 75 to 100 since December 26, 1996, and ten on that date alone, in order to challenge his testimony that he recalled that particular lineup.  The trial judge continued to sustain the objections.  Tr. 12951.

I agree with Bell that the trial judge erred in precluding the defense from questioning ADA Morse about his ability to recall past lineups.  The objection by the district attorney, that this evidence "is irrelevant to Mr. Morse's ability to recall this particular lineup," was simply wrong.  The number of lineups in which Morse participated was clearly relevant to his ability to recall the one in which Bell was identified, and Bell should have been permitted to impeach Morse's testimony by showing he had attended more than 350 lineups and more than 75 since the lineup at issue here.

Nevertheless, further cross-examination established that ADA Morse did not take any notes related to this lineup and was relying on his unaided memory with regard to events that had occurred two and a half years earlier.  More significantly, Bell's counsel was not precluded from asking Morse why he was able to recall the events of this particular lineup.  He very likely chose not to pose such a question because this was not an ordinary case that would blend in memory with the seventy-five other cases (many of which probably were not even homicide cases) that took place since the lineup at issue here.  This was a double homicide case in which one of the victims was a New York City Police Officer.  Indeed, Bell's counsel suggested to the jury that this was of particular concern to law enforcement officers involved in the investigation.  Tr. 10987, 11452.  And it was also one in which the District Attorney sought the death penalty.

14

Moreover, ADA Morse was merely a rebuttal witness, corroborating the earlier testimony of Turnbull and Detective Bovino, and any insinuation that ADA Morse's recollection was flawed would only have undermined the probative value of his corroborative testimony on an issue that may not have affected the verdict in any event.

i.      Response to the Order of Remand: Question 1

The foregoing ruling was an abuse of discretion and the only justification offered by the District Attorney—that it was "irrelevant to Mr. Morse's ability to recall this particular lineup"—was simply wrong.  Moreover, under the standard set out in *Watson v. Greene*, the "Appellate Division could not reasonably have determined that the [evidence] would have been excludable had the trial court properly applied standard rules of evidence concerning admissibility." *Watson*, 640 F.3d at 510.  Nevertheless, the exclusion of this evidence did not affect the outcome of the trial, or to use the standard in *Hawkins*, it would not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.  In sum, the exclusion of this evidence did not have a significant impact on the trial, there was other evidence casting doubt on Morse's ability to recall details of the investigation, and any error was ultimately overcome by the cumulative effect of other evidence in the case discussed above.

ii.     Response to the Order of Remand: Question 2

Bell makes no arguments in his post-remand memorandum, or as far as I can find, anywhere else, that the summation compounded the error in the trial court's ruling on the cross-examination of ADA Morse.

The Alibi Testimony of Esther Bell: Excerpt from Original Memorandum & Opinion

Bell's mother, Esther Bell, with whom he lived at 98-07 Northern Boulevard, several blocks southeast of the check-cashing store, would have testified that she saw her son in bed at

approximately 8:10 a.m. on December 21, 1996, Tr. 12540-41, approximately an hour after the murders. The trial judge precluded testimony on this subject because the defense failed to give the prosecution notice of alibi evidence, as required by N.Y. Criminal Procedure Law § 250.20. There is arguably some merit to the argument that the trial judge abused his discretion by precluding Esther Bell's testimony that her son was in bed an hour after the shootings took place, notwithstanding the failure of the defense to provide the notice of alibi.

Nevertheless, any error in this regard was harmless because Bell lived near the crime scene—three-fifths of a mile to be exact—and had more than ample time to return home before he was observed by his mother. Tr. 12524. Indeed, in arguing that a notice of alibi was not required, Bell's counsel acknowledged that "[t]here is no question . . . that a person could have committed this crime on Astoria Boulevard and 94th Street and been in bed at 7:30 in the morning." Tr. 12532. This concession was confirmed by Bell's confession where he said that, immediately after the crime, he went home, took "his clothes off that he was wearing, drops them on the floor of his bedroom" and "a short time after that" his mother entered the room. Tr. 11808. Under these circumstances, the "alibi" testimony, which came from an obviously interested witness, would have been of limited probative value and was unlikely to have affected the verdict in the face of other evidence of Bell's guilt.

i.   Response to the Order of Remand: Question 1

Esther Bell's testimony was excluded on the ground that the defense failed to give the prosecution notice of alibi evidence as required by N.Y. Criminal Procedure Law § 250.20. Bell's testimony was offered to permit the jury to draw the inference that the defendant must have been at home when the crime was committed. A holding that this comes within the meaning of N.Y. Criminal Procedure Law § 250.20 is purely a question of New York law, under

which it would appear that Esther Bell's testimony may not have been admissible without the requisite notice.  *See, e.g., People v. Evans*, 289 A.D.2d 417, 734 N.Y.S.2d 244 (2d Dep't 2001) (holding that evidence that accounts for a defendant's whereabouts during the crime, or shortly thereafter, counts as an "alibi" under § 250.20).  Nevertheless, the trial judge had the discretion to permit a previously unnoticed alibi witness on the condition that it grant the prosecution an adjournment not to exceed three days.  11A N.Y. CRIM. PROC. LAW § 250.20(3) (McKinney 2002).  While I previously found that there was some merit to the argument that the trial judge abused his discretion in not permitting Esther Bell's testimony, it does not rise to the level prescribed in *Watson* to justify concluding that its exclusion violated the Constitution.  The probative effect of this evidence was nil for the reasons suggested in my discussion of the issue above.  The trial judge could easily have concluded that waiving the failure to comply with § 250.20 was not worth the candle.  Moreover, I also found that the exclusion of this evidence did not affect the outcome of the trial, or to use the standard in *Hawkins*, it would not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.  In sum, the trial judge's ruling was not sufficiently erroneous to justify relief and the error was plainly harmless if only because Bell could have concededly both committed the crime and been in bed when Esther Bell saw him there at 7:30 a.m.

      ii.    <u>Response to the Order of Remand: Question 2</u>

Bell makes no arguments in his post-remand memorandum, or as far as I can find, anywhere else, that the summation compounded any error in the trial court's ruling on the admissibility of Esther Bell's testimony.

<u>Bertha Ligon's 911 Call: Excerpt from Original Memorandum & Opinion</u>

Bertha Ligon, who lived directly across the street from the check-cashing store, testified that she briefly saw four people enter the store that morning. She recognized one as Epstein, the store's owner, and she later learned one was Davis, the off-duty police officer. Ligon testified that she only saw the other two men from behind and that one of them was wearing a green army jacket. Ligon also testified that she heard gunshots and that the man in the green jacket left the store. By contrast, Turnbull testified that one of the men who entered wore a blue denim jacket and one wore a black goose down jacket.

Ligon called 911 and told the operator that the man she saw leaving the store wore a green jacket. She also testified that she did not recognize any of the men she later saw in a police lineup, as she did not see the faces of the perpetrators. The defense sought to introduce into evidence Ligon's 911 call. The trial judge precluded it on the grounds that it was cumulative of her testimony. Another defense witness, Jeanette Felix, also testified that she saw a man in a green jacket leave the store. Yet a third eyewitness, who was called by the defense, testified (by way of a stipulation) that one of two men she saw running away wore a light gray jacket and the other wore a light jacket. Tr. 13037.

The ruling precluding the admission of Bertha Ligon's 911 call, though error, was harmless. Ligon testified to all of the facts contained in that call. Significantly, the prosecutor did not cross-examine her in a way that challenged the truthfulness of her testimony regarding the color of the coat worn by one of the perpetrators. Nor did he suggest that it was a recent fabrication. Instead, the prosecutor relied on her testimony as corroborating the testimony of Turnbull. Thus, in his summation, he observed that Turnbull "describes the robbery the way Bertha Ligon describes it, from her vantage point. He describes how he sees these two men

18

behind the owner and the security guard pushed into the store.  That's what Bertha Ligon says."  Tr. 13130-31.

In his Appellate Division Brief, Bell argued that "when the prosecution challenged Ligon's reliability, by cross-examining about her eyesight and whether she got a 'good look' at the suspects, it opened the door to the 911 call."  Brief for Defendant-Appellant at 46.  While the prosecutor did pose these questions, they did not suggest that Ligon was lying.  Instead, they went to the issue of her ability to make reliable observations, an issue which the introduction of the 911 tapes would not have addressed.  Under the circumstances, even if error, the lost opportunity to bolster her testimony could not have had an effect on the outcome of the trial.

i.    Response to the Order of Remand: Question 1

I found the foregoing ruling to be an abuse of discretion.  Nevertheless, under the standard set out in *Watson v. Greene*, the Appellate Division could have "reasonably []  determined that the [evidence] would have been excludable had the trial court properly applied standard rules of evidence concerning admissibility."  *Watson*, 640 F.3d at 510.  The evidence was simply cumulative because it mirrored Bertha Ligon's testimony at trial, the credibility of which was unchallenged.  Indeed, because of the other evidence of guilt, the exclusion of this evidence could not possibly have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.  In sum, the exclusion of the 911 tape did not have a significant impact on the trial, it was cumulative of other evidence and, under the standard subsequently enunciated in *Watson*, there is no basis to conclude that the Appellate Division's rejection of Bell's argument constituted unreasonable application of clearly established Supreme Court law.

ii.    Response to the Order of Remand: Question 2

Bell argues that the prosecutor's summation unfairly challenged the credibility of Bertha Ligon's testimony after successfully persuading the trial court to exclude the transcript of her 911 call.  This argument is without merit for the same reason that the exclusion of this evidence is harmless.  Passing over the fact that another witness gave the same testimony, the prosecutor did not allude to Bertha Ligon's testimony regarding the color of the jacket worn by one of the perpetrator's, and to the extent that he challenged the reliability of her testimony, as stated above, it went to the issue of her ability to make reliable observations, an issue which the introduction of the 911 tapes would not have addressed.  Indeed, as I observe above, in his summation the prosecutor observed that Turnbull "describes the robbery the way Bertha Ligon describes it, from her vantage point."  Tr. 13130-31.  In sum, the prosecutor's summation did not exploit the harmfulness of the trial court's error in refusing to allow evidence of Ligon's 911 call.

2.  <u>Rulings Related to the Confession</u>

In this category, Bell contests the decisions that limited his ability to challenge his confession, specifically the trial judge's rulings precluding (1) expert testimony regarding the phenomenon of false confessions;(2) testimony from Bell's school psychologist regarding his low IQ test score and testimony from Bell's mother on his need for special education and his lack of experience with the criminal justice system; (3) cross-examination of Detective Pia with respect to his ability to recall events and the methods by which he allegedly induced Bell's statement; (4) testimony from Collier regarding Bell's treatment in police custody; and (5) questions regarding the description and arrest of the unknown co-conspirator named "Jason."

<u>The Exclusion of Expert Testimony: Excerpt from Original Memorandum & Opinion</u>

The defense sought to present expert testimony regarding false confessions in order to establish that such confessions may be elicited by means other than physical coercion.  The

20

evidence would have addressed the mistaken belief that an innocent person would never confess and explained how "the tactics used during Mr. Bell's interrogation are precisely those that, relevant studies indicate, create a risk of false or involuntary confessions."   Affirmation for Motion in Limine at 4.   The motion was not accompanied by the affidavit of a proposed expert relating to the substance of his testimony, his qualifications, or his conclusion that the tactics used during the interrogation were likely to yield a false confession.   Moreover, Bell's memorandum of law accompanying his offer of proof clarified that his expert would *not* testify that he "possessed characteristics that made it more likely that he would confess falsely to the police."   Mem. of Law in Supp. of Motion In Limine at 7 n.2.   Instead, "the expert will testify solely about various aspects of the general phenomena of false confessions . . . ."   *Id.*   Indeed, Bell did not submit an affidavit alleging that his confession was false, nor did he so testify.   Bell's offer of proof was essentially an essay surveying the published literature and studies, by which "researchers have demonstrated that those techniques, *while often successful in inducing truthful inculpatory statements*, also create a serious risk that a suspect will confess falsely." Affirmation for Motion in Limine at 5 (emphasis added).

Justice Cooperman denied the defense's request to admit expert testimony, concluding that the jury could determine the voluntariness of Bell's statements based on the facts presented and that expert testimony on false confessions does not pass the *Frye* test of general acceptance in its field.   *People v. Bell*, Ind. No. 128/97, slip op. at 3-4 (N.Y. Sup. Ct. Apr. 28, 1999).   This decision is consistent with a long line of New York cases, of which the most recent, *People v. Wiggins*, 16 Misc.3d 1136 (N.Y. Sup. Ct. 2007), contains a particularly thoughtful discussion of the issue.

Because the Supreme Court has never squarely addressed the issue, the decision was not contrary to any Supreme Court holding, nor did it constitute any unreasonable application of Supreme Court precedent. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *United States v. Scheffer*, 523 U.S. 303, 309-10 (1998) (upholding exclusion of expert testimony regarding polygraph examination under rules designed to prevent admission of unreliable testimony). Particularly apposite here is the holding of the Supreme Judicial Court of Massachusetts, which upheld the exclusion of the testimony of Professor Saul Kassin, one of the scholars on whose work Bell also relied. *Commonwealth v. Robinson*, 449 Mass. 1, 5-6, 864 N.E.2d 1186, 1189-90 (2007). The Supreme Judicial Court summarized the proffered evidence as follows:

> Professor Kassin is a professor of psychology at Williams College who has authored books and articles concerning police interrogation and confessions, an area, according to him, of recognized scholarly study. He has conducted controlled experiments testing his theories and had previously testified in other jurisdictions as an expert on interrogation and confessions. His fellow "experts" were unanimous that false confessions occur, and in his opinion, certain traditional methods of police interrogation increase the likelihood of a false confession. For example, according to Professor Kassin, threats, promises, and moral issues may have an impact on a suspect's thought process, including his consideration of the costs and benefits of cooperation. Although he admittedly had not tested the defendant in the present case and could not assess his vulnerability to pressure, the professor opined that the techniques used by Detective Kelleher were psychologically "powerful" and had the potential of eliciting false confessions from innocent suspects. He also stated that his research indicates that jurors are not well equipped to assess the interaction between interrogation methods and confessions. Nevertheless, on cross-examination the professor conceded that there was no empirical data on the number of false confessions, and that there is no scientific basis for distinguishing true from false confessions. Indeed, he admitted that one of his articles stated, "Further research in the field is sorely needed. . . . [T]he current empirical foundation may be too meager to support recommendations for reform or qualify as a subject of scientific knowledge." The professor also said that, in fact, in mock jury experiments, jurors were able to distinguish accurately voluntary from involuntary confessions.

He agreed that he could not say that lay people could not accurately assess the techniques that would cause false confessions.

*Id.*  In a footnote, the Supreme Judicial Court observed:

> The only significant experiment described by Professor Kassin apparently involved confronting student typists with a witness who claimed to have seen the students touch a key they had been instructed not to touch.  The students consistently denied hitting the key until they were confronted by the witness.  After that, sixty-nine percent of them admitted touching the key.  There was no testimony that the typists knew that, in fact, they had not touched the key during the experiment.  Professor Kassin also acknowledged that this was not the same as people "confessing to a crime with severe, long-term consequences."

*Id.* at 1190 n.7.  Under these circumstances, the Supreme Judicial Court concluded that Kassin's proposed testimony did not meet the requirements for the admissibility of expert testimony in Massachusetts, namely "general acceptance in the scientific community or [a] showing that the evidence is reliable or valid through an alternative means."  *Id.* at 1189.

As far as I can see, there is little in the published literature inconsistent with Professor Kassin's testimony in *Commonwealth v. Robinson*.  Indeed, in the article which Bell cited in his Motion in Limine, Professor Kassin writes that, "[a]lthough many instances of false confessions have been documented throughout history, it is impossible to determine or even estimate the risk under varying circumstances."  Saul M. Kassin & Karlyn McNall, *Police Interrogations and Confessions—Communicating Promises and Threats by Pragmatic Implication*, 15 LAW AND HUM. BEHAV. 233, 248 (1991).  Professors Ofshe and Leo observe that, "[w]hile some scholars attempt the analysis of false confessions separately from that of true confessions, . . . the similarities between true and false confessions are more impressive than their differences."  Richard J. Ofshe & Richard A. Leo, *The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions*, 16 STUD. IN LAW, POL. & SOC'Y 189, 190 (1997).  Professors Ofshe and Leo do observe that "it is not uncommon for suspects—especially

23

highly suggestive ones such as the mentally handicapped, juveniles, and individuals who are unusually trusting of authority—to give false confessions in response to police inducements that do not legally qualify as coercive or fundamentally unfair."  Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U. L. Rev. 979, 1117 (1997).  Bell, however, acknowledged that his proffered expert would *not* testify that Bell "possessed characteristics that made it more likely he would confess falsely to the police." Mem. of Law in Supp. of Motion in Limine at 7 n.2.

This is not the only reason why the exclusion of the evidence does not warrant relief here. Bell failed to provide an affidavit or to testify at the suppression hearing, even though he had no reason to remain silent.  Any testimony he gave at the suppression hearing could not have been used against him, *Simmons v. United States*, 390 U.S. 377, 393-94 (1968), and he did not have any prior convictions that could have been used to impeach his credibility at trial.  *Cf. United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976) (observing that the defendant chose not to take the stand during the suppression hearing to rebut the version of the events offered by the prosecution's witnesses, although he might have done so without risk that anything he said there could later be used against him).  Without testimony by the "principal witnesses on [Bell's] side," to borrow a phrase from Judge Posner in an analogous case, *Pecoraro v. Walls*, 286 F.3d 439, 446 (7th Cir. 2002), or a convincing alibi, it seems unlikely, if not inconceivable, that a jury would have acquitted Bell based on expert testimony that, while the tactics used by the police during the interrogation could induce truthful confessions, they were also associated with false confessions.[2]  Such an outcome is particularly unlikely in a case in which an eyewitness and an

---

[2]  In *United States v. Hall*, 974 F. Supp. 1198 (C.D. Ill. 1997), the principal case relied upon by petitioner, the district court held that Dr. Ofshe could testify "that false confessions do exist, that

accomplice corroborated the confession, and in which telephone records established that sixty-five minutes prior to the attempted robbery and double homicide, Gary Johnson, whom Bell and Bigweh identified as one of their accomplices, called Bell's home.  (Johnson had also implicated Bell in a confession that was not admitted at the trial.)  Specifically, the calls from Johnson came at "5:54, and 47 seconds in the morning" and "at 5:55:07 in the morning."  Ex. 45.  The first call lasted eleven seconds and the second lasted one minute and 46 seconds.  Tr. 12254-55. Notwithstanding the effort of Bell's sister to explain the calls away by testifying that they were for her, Tr. 12838-39, they constituted a compelling piece of corroborating circumstantial evidence that the jury asked for during its deliberations.  Tr. 13397.

There is one final consideration, apart from the corroborative evidence, that undermines the claimed prejudice resulting from the exclusion of the proffered testimony.  New York allows a defendant to relitigate the issue of the voluntariness of his confession before the jury, notwithstanding a pretrial ruling denying the motion to suppress the confession. The defendant is also permitted to challenge the truthfulness of his confession.  While the jury here was instructed that these were two separate and distinct issues, Tr. 13293, as a practical matter, Bell's argument melded the two of them into one.  Specifically, he argued that he was coerced into making a false confession.  As his attorney told the jury, "[t]he videotape is a product of terror, not a statement of truth."  Tr. 13083.  Thus, the jury could not conclude the confession was false without first considering whether it was voluntary.  On this score, the jury was instructed, in relevant part:

> Our law does not specifically define when a statement is "voluntarily made." Instead, it defines when a statement is "involuntarily made."  In general, our Criminal Procedure Law provides that a statement that a defendant is "involuntarily made" and therefore may not be considered by the jury, if it is

---

they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in Hall's interrogation in this case."  *Id.* at 1205.

> obtained by the police or by a prosecutor.  One; by means of use of force or by
> threats of the use of force, or two; by means of deception, trickery or promises
> likely to induce an unwilling statement.  Three, by means of any other improper
> conduct or undue pressure which impaired the defendant's physical or mental
> condition to the extent of undermining his ability to make a choice whether or not
> to make a statement.

Tr. 13292.  These considerations are those which the scholarly writings suggest may lead to a false confession.  *See, e.g.*, Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 DENV. U. L. REV. 979, 1117-18 (1997) ("The most common type of false confession is elicited through tactics that depend on communicating obvious or implied threats.").[3]  Similarly, in the principal case upon which Bell relies,

> Dr. Ofshe testified that no one factor or combination of factors could guarantee a
> false confession but that some factors might heighten the likelihood of one.
> While a number of factors were present in both true and false confession cases, a
> major distinguishing factor for false confessions is the interrogator's continued
> use of coercion either through false accusations or false promises of leniency.

*United States v. Hall*, 974 F. Supp. 1198, 1204 (C.D. Ill. 1997).  Thus, the jury's threshold determination of the voluntariness of the confession necessarily involved consideration of many of the factors that are said to be identified as relevant to its truthfulness.  Moreover, the instruction to the jury that "the People are required to prove to your satisfaction beyond a reasonable doubt that each statement was 'truthful,'" Tr. 13293, constituted a signal to the jury that the truthfulness of Bell's confessions was not to be presumed.

  i.  <u>Response to the Order of Remand: Question 1</u>

---

[3]   The parenthetical above refers to the tactics that lead to "the most common type of false confessions."  Ofshe and Leo list others that fall into the category of tactics which—in the words of the jury charge—"impair the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement."  *See* Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 DENV. U. L. REV. 979, 1117 (1997).

The ruling excluding the expert testimony was correct under New York law.  Indeed, I observed that the trial judge's decision "is consistent with a long line of New York cases, of which the most recent, *People v. Wiggins*, 16 Misc.3d 1136 (N.Y. Sup. Ct. 2007), contains a particularly thoughtful discussion of the issue."  Moreover, in *Curry v. Burge*, No. 03-901, 2007 WL 3097165 (S.D.N.Y. Oct. 23, 2007), United States Magistrate Judge Peck, who has authored a number of exhaustive habeas corpus reports and recommendations, cited approximately a half dozen Appellate Division and lower court cases to support the proposition that, at the time of Curry's trial in 1988 and since, New York State cases "have not allowed false confession expert testimony."  *Id.* at *18 n.25.  While I do not burden this opinion with a string cite from his opinion, I do cite a number of additional New York cases, particularly several by the Appellate Division Second Department, which refused to allow false confession expert testimony.  *See, e.g., People v. Days*, 817 N.Y.S.2d 535, 31 A.D.3d 574 (2nd Dep't 2006); *People v. Ragsdale*, 889 N.Y.S.2d 681, 68 A.D.3d 897 (2nd Dep't 2009); *People v. Green*, 683 N.Y.S.2d 597, 250 A.D.2d 143 (3d Dep't 1998); *People v. Crews*, 18 Misc. 3d 1120(A), 2008 WL 199887 (Suffolk Cty. 2008); *People v. Rosario*, 20 Misc. 3d 401 (Queens Cty. 2008).

More significantly, the issues related to the admissibility of expert testimony generally, and to this testimony in particular, make clear that each step in determining the admissibility involves the exercise of discretion.  "As a general rule, the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court.  'It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness.'"  *People v. Lee*, 96 N.Y.2d 157, 162 (2001) (quoting *People v. Cronin*, 60 N.Y.2d 430, 433 (1983)).  Moreover, the

issue whether the expert testimony is sufficiently reliable and probative, as judged under *Daubert* or *Frye*, likewise involves an element of discretion.  FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 23 (3d ed. 2011).  Indeed, even when a trial court holds that the testimony of an expert may have been scientifically reliable, it still retains the discretion to exclude the testimony because its potentially prejudicial impact may outweigh its probative effect.  *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).  Thus, as Second Circuit has held, even on a direct appeal in which AEDPA deference plays no role, "[a] decision to exclude expert testimony rests soundly with the discretion of the trial court and shall be sustained unless 'manifestly erroneous.'"  *Id.*  Similarly, although the New York Court of Appeals held that there was a sufficient basis to admit expert testimony relating to the reliability of eyewitness identification, it cautioned that, "the admissibility of such evidence would also depend upon the existence of sufficient corroborating evidence to link defendant to the crime."  *People v. LeGrand*, 8 N.Y.3d 449, 459 (2007).  Where such evidence was found to exist, "excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant."  *Id.*

Many of the New York cases, particularly those of the Appellate Divisions, do not go into significant detail as to the reasons for exclusion of expert testimony relating to confessions, which is why I relied on a thorough and exhaustive discussion of the Supreme Judicial Court of Massachusetts, which concluded that proposed testimony of one of the experts on whom Bell relied, Professor Saul Kassin, did not meet the requirement for admissibility of expert testimony because of a lack of general acceptance in the scientific community and the lack of a showing that the evidence is reliable or valid through an alternative means.  This consideration aside, New York cases that do address the issue consistently hold that jurors are able to draw conclusions from the evidence based on their own day-to-day experience, their common observation and their

28

knowledge.  Indeed, the only case cited by Bell, *People v. Kogut*, 10 Misc.3d 305 (Nassau Cty. 2005), held that "[t]he fact that psychological techniques of influence and persuasion have long been recognized by the courts suggests that such techniques are within the experience of lay jurors.  Indeed, the court takes notice of the fact that the use of psychological techniques by interrogators is frequently described in the news and entertainment media."  *Id.* at 311.  Similarly in *People v. Shepard*, the Third Department held that, "the subject of whether a person has falsely confessed does not depend upon the professional or scientific knowledge or skill not within the range of ordinary training or intelligence, and therefore, there is no occasion to resort to expert testimony."  *People v. Shepard*, 687 N.Y.S.2d 196, 259 A.D.2d 775, 777 (3d Dep't 1999) (quotations omitted).  Finally, in *People v. Wiggins*, 16 Misc.3d 1136 (N.Y. Sup. Ct. 2007), which I cited in my original opinion, the trial judge observed:

> Recognizing a lie is not a subject beyond the ken of the average juror. Lay people must and do decide every day whether or not they are being lied to. Lay people are also perfectly aware that some confessions are false—if for no other reason than that the theme of false confession is a staple of our news media, literature and drama, especially television drama. Recent highly publicized news stories—like those of the exonerated Central Park Jogger defendants and of John Mark Karr (who tried to claim responsibility for the death of Jon Benet Ramsey)—have made the phenomenon of false confession especially prominent.
> In practice, criminal defense lawyers have no difficulty arguing, and jurors have no difficulty accepting (in an appropriate case), the idea that a defendant may confess falsely out of one of many possible motivations. (For example, a defendant—especially a young and callow defendant—may falsely confess a crime in order to garner attention, to impress others with his daring, to help a guilty friend, or out of fear of police interrogators.) Similarly, lay jurors know—without the aid of expert testimony—that young people, or people with psychological or mental limitations, may be particularly vulnerable to manipulation by the police in an interrogation setting.

*Id.* at *12; *see also People v. Crews*, 18 Misc.3d 1120(A), 2008 WL 199887, *2 (Suffolk Cty. 2008).  Moreover, particularly in a case in which the defendant has not testified or explained the reasons for his confession, or even denied the accuracy of it, the admissibility of expert

testimony always runs the risk of a jury making a determination based on speculation rather than hard evidence.

In the present case, consistent with New York law, the trial judge exercised discretion to exclude the expert testimony for the following reasons:

> Defendant states that the expert in this case is prepared to testify about various aspects of the general phenomenon of false confessions, leaving the question of whether defendant's confession was accurate or false to the jury (Defense Memorandum p.7 fn.2). Since abstract principles of social science as applied to a confession will be espoused, without anything to warrant their application to this defendant, the proposed testimony would unduly confuse the jury and confound the issues in the case.
>
> The issue of whether defendant's inculpatory statements were voluntarily made is a question for the jury to determine. The circumstances of the questioning and confession will be presented to the jury which will be able to make this determination. Because the subject matter is not beyond the ken of a typical juror, a jury of average intelligence could form a proper conclusion without the aid of an expert.

*People v. Bell*, Ind. No. 128/97, slip op. at 3-4 (N.Y. Sup. Ct. Apr. 28, 1999).

This was not an abuse of discretion. Moreover, the Appellate Division could "reasonably have determined that the [evidence] would have been excludable had the trial court properly applied standard rules of evidence concerning admissibility." *Watson*, 640 F.3d at 510. Nevertheless, the exclusion of this evidence did not affect the outcome of the trial, or to use the standard in *Hawkins*, it would not have created a "reasonable doubt that did not otherwise exist." *Hawkins*, 460 F.3d at 244. Even if such testimony had been before the jury, it is inconceivable that the jury would have concluded that the confession was false without hearing from Bell as to the reasons for his confession (however valid his reason for not testifying may have been). This is particularly true because the jury would have heard the expert acknowledge that improper techniques are "often successful in inducting truthful inculpatory statements." Affirmation for Motion in Limine at 5. Finally, the judge's charge on the voluntariness of the confession, as I

explained above, essentially provided the jury with information almost comparable to that which would have been offered.

    ii.    <u>Response to the Order of Remand: Question 2</u>

Bell argues that the prosecutor exploited this ruling excluding the expert testimony by contending during summation that the interrogation was not of the type that could have resulted in a false confession.  Because the trial court's ruling was not in error the prosecutor's statements here did not add to the collective prejudicial impact of any erroneous evidentiary rulings. Nonetheless, I observe that defense counsel was able to forcefully and extensively argue, without the expert testimony, that Bell's confession should not be credited.  Tr. 13045 *et seq.*

<u>The IQ and Special Education Testimony: Excerpt from Original Memorandum & Opinion</u>

The trial judge precluded testimony from Marni Cohen—a school psychologist who had administered an IQ test to Bell in 1994—that he had an IQ of 74.  The ground for the objection was that the defense failed to provide notice of psychiatric evidence, as required by N.Y. Criminal Procedure Law § 250.10.  It is hardly clear from the language of § 250.10 that it encompasses evidence of IQ.  Indeed, at the penalty phase, the defense once again offered this evidence, without comporting with N.Y. Criminal Procedure Law § 400.27(13)(b), which prescribes a similar notice requirement for the death penalty phase of the trial.  The trial court denied the prosecutor's motion to have Bell examined and permitted her to testify.  *People v. Bell*, 181 Misc. 2d 186 (Queens Cty. 1999).  Cohen testified at the penalty phase that she had administered an IQ test to Bell in 1994, and that his full-scale IQ at the time was 74.  While this was a comparatively low IQ, she testified that Bell was not mentally retarded.  Tr. 13741. Specifically, she testified that such a diagnosis could not be made without an adaptive functioning test.  "In order to classify an individual as mentally retarded, they must score below

31

70 on both the IQ score and the adaptive behavior score.  Thus, they are only administered when a student scores below 70 on an IQ score."  Tr. 13761.  The adaptive functioning test is only "when you have an idea that you're going to classify that student as mentally retarded, and then you need to administer it, but if I get a [IQ] score above 70, I would never administer it."  Tr. 13778.

The trial judge also precluded testimony from Esther Bell that her son was a special-education student with learning disabilities who had not graduated from high school and had no police record.  At a pretrial suppression hearing, she testified that Bell had "a learning disability in mostly math and English so he was placed in Special Ed classes."  Tr. 298.  It is not clear from the record why this evidence was excluded at trial.  Outside the presence of the jury, Justice Cooperman and the attorneys for the prosecution and the defense discussed this evidence, though only generally and in conjunction with the proffered IQ evidence, in light of the defense's failure to provide the notice required by state law.

The Supreme Court has explicitly held that a defendant does not have a constitutional right to litigate the issue of voluntariness before a jury, once a judge has found that the defendant's statement was not the product of coercion.  *Lego v. Twomey*, 404 U.S. 477, 489-90 (1972).  Nevertheless, the Supreme Court has also observed that "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess."  *Crane v. Kentucky*, 476 U.S. 683, 688 (1986).  The Supreme Court continued:

> Confessions, even those that have been found to be voluntary, are not conclusive of guilt.  And, as with any other part of the prosecutor's case, a confession may be shown to be insufficiently corroborated or otherwise . . . unworthy of belief. Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent,

32

> why did he previously admit his guilt?  Accordingly, regardless of whether the
> defendant marshaled the same evidence earlier in support of an unsuccessful
> motion to suppress, and entirely independent of any question of voluntariness, a
> defendant's case may stand or fall on his ability to convince the jury that the
> manner in which the confession was obtained casts doubt on its credibility.

*Id*. at 689 (internal quotation marks and citations omitted).  In that case, the Supreme Court went

on to hold that the state courts "erred in foreclosing Bell's efforts to introduce testimony about

the environment in which the police secured his confession," especially where the "[p]etitioner's

entire defense was that there was no physical evidence to link him to the crime and that, for a

variety of reasons, his earlier admission of guilt was not to be believed."  *Id.* at 691.

In *Crane*, the defendant, who was 16 years old at the time of his arrest, sought to

introduce evidence about the length of his interrogation and the manner in which it was

conducted in order to show the jury that his confession was not credible and should be

disregarded.  *Id.* at 685-86.  In the present case, by contrast, Bell seeks to introduce evidence

regarding his background rather than the circumstances of his interrogation.  *Crane* focused on

the "physical and psychological environment" in which the confession was obtained, a phrase

Justice O'Connor used on multiple occasions.  *Id.* at 684, 689.  As one Court of Appeals

recognized, however, *Crane* did not address whether the "physical and psychological

environment" encompassed only objectively verifiable factors affecting the confessor's physical

and emotional state—such as the setting, duration, manner, and content of the police

interrogation— or whether it also included "the psychological makeup of the confessor."  *United*

*States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001).

While I believe that it is an unreasonable application of *Crane* to exclude evidence of the

psychological makeup of a defendant whose confession has been admitted in evidence, the offer

of proof made by Bell did not provide a significant predicate for concluding that the evidence

was related to the likelihood that Bell would confess falsely to a crime that he did not commit. Instead, as I have previously observed, the essay comprising the offer of proof suggests that "juveniles, people with mental impairments and those who are unusually trusting of authority," are especially vulnerable to interrogation techniques used by law enforcement officers to obtain a confession. Affirmation for Motion in Limine at 6. The evidence proffered by Esther Bell and Marni Cohen did not place Bell squarely in any of these categories. Indeed, as I already observed, Bell acknowledged that his proffered expert would not testify that Bell "possessed characteristics that made it more likely he would confess falsely to the police." Mem. of Law in Supp. of Motion in Limine at 7 n.2.

Moreover, the likelihood that proffered evidence would have led the jury to discredit Bell's confession, as I said earlier, is nil. In cases in which a videotaped confession is offered, corroborated as it was in this case, the only hope of discrediting the confession is testimony by the defendant denying the truth of the confession and explaining why he confessed falsely (or offering compelling evidence that the confession was false, such as an airtight alibi). The testimony of Bell's mother, in isolation, that he was in special education because of difficulty he had in math and English, did not graduate from high school, and had no criminal record (though he actually had once been arrested for robbery, Tr. 12895) simply does not do it. The same is true with respect to the testimony regarding Bell's IQ.

     i.    <u>Response to the Order of Remand: Question 1</u>

Whether the exclusion of the IQ evidence was justified at the threshold by N.Y. Criminal Procedure Law § 250.10 is a matter of New York law. While § 250.10, on its face, only requires notice of an intent to proffer psychiatric evidence with respect to various defenses, it has been interpreted to include "any condition bearing upon defendant's mental state, irrespective of

34

whether that concerns something statutorily denominated as a defense." 11A N.Y. CRIM. PROC.
LAW § 250.10 cmt. (McKinney 2002); *see also People v. Mai*, 573 N.Y.S.2d 90, 175 A.D.2d 692
(1st Dep't 1991); *People v. Oakes*, 565 N.Y.S.2d 648, 168 A.D.2d 893 (4th Dep't 1990).
Nevertheless, assuming that probative evidence may in certain circumstances be precluded if a
defendant fails to comply with a valid discovery rule, *see Michigan v. Lucas*, 500 U.S. 145, 152
(1991), the New York Court of Appeals has cautioned that the decision to exclude evidence on
the basis of the late notice is subject to close scrutiny.

> The decision whether to allow a defendant, "[i]n the interest of justice and for
> good cause shown," to serve and file late notice of intent to introduce psychiatric
> evidence is a discretionary determination to be made by the trial court (CPL
> 250.10; *see, People v Di Donato*, 87 N.Y.2d 992). The trial court's discretion in
> this matter, however, is not absolute. Exclusion of relevant and probative
> testimony as a sanction for a defendant's failure to comply with a statutory notice
> requirement implicates a defendant's constitutional right to present witnesses in
> his own defense (*see,* US Const 6th, 14th Amends; *see also, Ronson v
> Commissioner of Correction,* 604 F.2d 176, 178). In making its determination,
> the trial court must therefore weigh this right against the resultant prejudice to the
> People from the belated notice.

*People v. Berk*, 88 N.Y.2d 257, 265-66 (1996).

The record suggests that the trial judge may have engaged in the exercise of discretion
here because he admitted this evidence at the penalty phase after apparently concluding that
perhaps a less rigorous enforcement of the preclusion remedy was appropriate in that context,
and he did so without giving the prosecutor the three days that he sought to obtain his own
examination of the defendant. In my view, the trial judge abused his discretion in excluding the
same evidence at trial. Nevertheless, the Appellate Division could have reasonably concluded
that the evidence "would have been excludable had the trial court properly applied the standard
rules of evidence concerning admissibility." *Watson*, 640 F.3d at 510. Simply stated, and as
explained above, "the offer of proof made by Bell [with respect to his I.Q.] did not provide a

35

significant predicate for concluding that the evidence was related to the likelihood that Bell would confess falsely to a crime that he did not commit." The same is true with respect to the testimony of Esther Bell regarding Bell's special education because he had difficulty in math and English, did not graduate from high school, and had no criminal record (though he actually had once been arrested for robbery). Nor would the admission of the expert testimony relating to confessions have cured this defect because, as previously noted, Bell's memorandum of law accompanying his offer of proof clarified that his expert would not testify that he "possessed characteristics that made it more likely that he would confess falsely to the police." Mem. of Law in Supp. of Motion in Limine at 7 n.2. Under these circumstances, the Appellate Division could have reasonably concluded that the exclusion of this evidence did not constitute an abuse of discretion.

Moreover, passing over the other corroborative evidence of Bell's guilt, the circumstances which significantly undermine the probative value of this proffered evidence also clearly establish that these errors were harmless and would not have affected the outcome of the trial, or to use the standard in *Hawkins*, admitting the IQ evidence and Esther Bell's testimony would not have created a "reasonable doubt that did not otherwise exist." *Hawkins*, 460 F.3d at 244. In sum, although the apparent legal basis for the trial judge's ruling on the IQ evidence was erroneous, the Appellate Division could have concluded that it would have been excludable "had the trial court properly applied 'standard rules of evidence' concerning admissibility.'" *Watson*, 640 F.3d at 510. The same is true with respect to the exclusion of the testimony of Esther Bell, for which no explanation appears in the trial transcript. Nevertheless, any error on this score is harmless.

       ii.     <u>Response to the Order of Remand: Question 2</u>

Bell argues that the prosecutor's summation exploited the trial court's ruling excluding the IQ and special education.  Specifically, the prosecutor stated that Bell was "an adult who made adult decisions," Tr. 13089, and argued that there was no basis in the record for the defense to claim that Bell was too "unsophisticated" or "stupid" to tell the truth during the police interrogation that resulted in his confession.  Tr. 13090-91.  This claim is without merit.  First, Bell was nineteen years old, Tr. 13050, there is no doubt that Bell was legally considered an adult under any definition, and he was also employed.  Tr. 10989.  Moreover, the testimony that was excluded would not have established that Bell was too "unsophisticated" to tell the truth— the words Bell's counsel used to describe him in his summation, to which the prosecutor was responding.  Tr. 13050-51.  In her testimony, during the penalty phase, the psychologist who administered the IQ test provided little basis for contradicting the prosecutor's summation.  *See* Tr. 13748 *et seq.*   Indeed, she testified that an IQ test is a reflection of prior academic achievement and a predictor of subsequent educational performance.  Tr. 13760.  Nevertheless, she also testified that Bell's stated ambition was to be an electrician or a mechanic, and she thought it was "reasonable for him to set his sights on those types of vocations."  Tr. 13766.

Additionally, the psychologist testified that Bell indicated that his "current school performance was fair, he received two unsatisfactories in gym and Spanish, he received an N, which stands for 'needs improvement' in global history" and that his grades in other classes were satisfactory.  Tr. 13758.  Moreover, the records made available to her also indicated that he received mostly satisfactory grades in the past.  *Id.*  The psychologist's testimony, which would have come in had she testified at trial, would have undermined the already limited probative value of Esther Bell's testimony regarding her son's academic performance.

Finally, Bell's subsequent possession of his own legal papers and newspaper clippings while awaiting trial clearly suggested that he had a sufficient understanding of these materials and the situation he faced.  In sum, the IQ and special education evidence had very little probative value.  The prosecutor's summation did not exploit the harmfulness of the trial court's error in excluding this evidence.

### The Cross-Examination of Detective Pia: Excerpt from Original Memorandum & Opinion

Detective Pia testified as to the facts and circumstances of Bell's confession, and Bell's written confession was read into evidence.  ADA Reese later testified as to the circumstances of Bell's videotaped confession, and the videotape was played in open court.  The defense cross-examined Detective Pia at considerable length.  The trial judge sustained objections to questions about how many times Detective Pia had previously testified in court; how many suspects he had previously interrogated; what he knew about the facts of the case before he interrogated Bell; and whether Detective Sica, who was present for the interrogation, spoke to Bell prior to his interrogation when he and Detective Pia first encountered him hand-cuffed to a chair outside Lieutenant Nevins's office.  Tr. 11863.  Later in the cross-examination, Detective Pia denied supplying Bell with the details contained in his statement to the police, in which he confessed that he had committed the murders.

The defense's cross-examination of Detective Pia regarding how many times he had testified and how many suspects he had interrogated was only marginally relevant to the proceedings.  There was testimony, as Bell's counsel observed in his summation, that Detectives Pia and Sica were assigned to interrogate Bell "because they were very experienced detectives in getting suspects to make statements."  Tr. 13053 (quoting from the testimony of the Lieutenant Nevins, Tr. 11742, who assigned them to question Bell).  Moreover, while a question relating to

38

Detective Pia's prior knowledge of the details of the crime (to which an objection was sustained) was relevant to an argument that he had provided those details to Bell, common sense would suggest that Detective Pia would not have been assigned to the interrogation without such knowledge.  As Bell's counsel told the jury, some of the details "could have been fed to George by the police who obviously had details."  Tr. 11000.  Indeed, Detective Pia testified that, when Bell initially said that he used a silver .380 automatic weapon, Tr. 11798, "[o]ne of the things I had going into talking to Mr. Bell, was the fact that I knew that all the ballistics evidence was of a 9 mm caliber," Tr. 11799, which apparently caused Bell to correct his confession.  Tr. 11800.

Moreover, Detective Pia expressly testified that, aside from his knowledge of the ballistics evidence, he had previously perused a copy of Bigweh's confession implicating Bell, Tr. 11852, and he had also obtained other information from Detective Sica.  Tr. 11859.  Indeed, Pica testified that he told Bell at the start of the interrogation that, "there are other people in this precinct that detectives are speaking to and they are telling their side of the story.  So why don't you tell us your side, because I know that you have knowledge of what happened and I know you were involved."  Tr. 11901.  While Detective Sica was not called as a witness at trial, he testified at the suppression hearing that, when he had arrived at the precinct, a Captain McCarthy got him "up to speed on what was happening with the case" and that he was provided with and read Bigweh's statement.  Tr. 319.  Because Bigweh's statement, as summarized at the suppression hearing, Tr. 19-20, differed from Bell's confession, Pia's knowledge of its contents would not have supported the argument that he fed the details of Bigweh's statement to Bell.

The foregoing discussion sufficiently addresses the prejudice relating to the ruling limiting the cross examination of Detective Pia.  I add these brief words regarding Bell's confession.  My reading of the record indicates that Bell was able to cross-examine Detective Pia

extensively and effectively regarding the events surrounding Bell's statement to the police and

that Bell was able to mount a substantial challenge to the reliability of his confession.  Indeed, as

the District Attorney observes, there was ample evidence from which "the defense was able to

argue at length that there were errors in Bell's statement that cast doubt on its validity."  Letter of

Linda Cantoni, Assistant District Attorney (Oct. 30, 2007) at 12 (citing parts of the confession

that were shown to be inconsistent with the evidence).  And, at one point in the course of the

videotaped confession, Bell said "in a whisper 'being framed.'"  Tr. 11993.  Nevertheless, the

problem Bell faced, and which he could not overcome without testifying, was the other evidence

corroborating his guilt.

### i.   Response to the Order of Remand: Question 1

To the extent that the trial judge sustained objections to Bell's cross-examination of

Detective Pia, the rulings were wrong and constituted an abuse of discretion under New York

law.  Nevertheless, as the discussion above makes clear, other testimony that the judge admitted

more than compensated for the alleged prejudice that Bell may have suffered.  For this reason,

and because of the other corroborating evidence, admission of the objected-to evidence would

not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.  In

sum, as the discussion above concludes, "the problem Bell faced, and which he could not

overcome without testifying, was the other evidence corroborating his guilt."

### ii.   Response to the Order of Remand: Question 2

Bell argues that the prosecutor's summation exploited the trial court's ruling excluding

certain questions during the cross-examination of Detective Pia, although it is not clear how he

did so.  Specifically, Bell's post-remand memorandum argues that the "state successfully

prevented the defense from establishing what Pia's partner, Police Detective Sica, said before

and during the interrogation . . . ."  Pet.'s Mem. of Law 62, ECF No. 37.  This argument is not entirely accurate.  While the trial judge may have erroneously sustained an objection to questions posed to Pia, Bell was not precluded from calling Sica as a witness to testify to what he said, just as Bell called Sica to testify during the suppression hearing.

The reason Bell did not call Sica was because Sica testified at the suppression hearing that the only thing he said to Bell prior to the interrogation was as follows: "I introduced myself. I told him that I was going to unhandcuff him from the chair, and that we were going to walk in another room" where Bell was questioned by Pia and Sica together.  Tr. 322-23.  Moreover, Sica also testified that Pia did most of the talking during the interrogation, although Sica told Bell that he did not believe his story.  Tr. 331.  Beyond that, there was no other conversation.  Tr. 331. Similarly, in response to defense questioning during the suppression hearing, Detective Pia stated that the only communication between Sica and Bell prior to the interrogation was a simple introduction.  Tr. 127, 141.  Detective Pia also explicitly denied that Sica threatened or physically struck Bell.  Tr. 153, 163.  Indeed, in his testimony at trial, Pia said that "in the conversation I had with Mr. Bell I did most of the talking.  If Detective Sica uttered a few words, there was no vulgarity in those words."  Tr. 11874.  What is clear, and what Bell's counsel well knew, is that additional questioning of Sica or Pia would not have provided any evidence to contest the validity of Bell's confession during interrogation.  Thus, any prejudice created by the trial court's ruling was slight and was not exacerbated or exploited by the prosecutor's summation referring to Detectives Pia and Sica's interrogation of Bell.

Collier's Testimony: Excerpt from Original Memorandum & Opinion

Mendez Collier [who is sometimes referred to in the transcript as "Carl"] was one of those arrested along with Bell, on December 24, 1996.  Collier was called as a defense witness.

41

While the trial judge permitted Collier to testify that he saw Bell handcuffed, that he appeared sad, and that he was crying, he sustained an objection to a question of whether Collier heard a police officer say anything to Bell when he saw him at the precinct.  Tr. 12473.  Subsequently, on redirect, an objection was sustained to the question of whether, while he was at the precinct, Collier "hear[d] any police officer yell out or threaten George."  Tr. 12493.  Then, in a motion to reopen the examination of Collier, Bell's counsel advised the judge that Collier would have testified that he observed "the shouting at Mr. Bell in a threatening manner and not permitting Mr. Bell to speak [to him]."  Tr. 12501.  Nevertheless, it is clear from the record that this incident—assuming it occurred—must have taken place prior to 4:30 a.m., when Bell's interrogation began.  Bell and Collier were questioned in different rooms.  Tr. 12469, 12471-73.  Nor was it clear from the question or the offer of proof when, in relation to the time Bell confessed, Collier made the observation at issue, or which police officer was shouting.

The trial judge erred in sustaining this objection, although the error is not sufficient to warrant relief.  Detective Pia testified that during the questioning, Bell was "nervous and fidgety," and that he later cried for a very brief period of time.  Tr. 11860.  In light of this testimony and Collier's testimony regarding his observations of Bell, and the fact that Collier was yelled at and threatened and that the police unsuccessfully sought to have him confess, evidence conforming to the offer of proof would not likely have affected the verdict.  Again, as a practical matter, it is virtually impossible for a defendant to succeed in persuading a jury that his confession, corroborated by an eyewitness identification, the confession of an accomplice, and by other circumstantial evidence, was untrue without taking the stand and explaining why he confessed.  Significantly, during its deliberations, the jury asked for the videotape of the confession, Tr. 13365, the eyewitness testimony, Tr. 13397, and the telephone logs of the calls

42

Gary Johnson made to Bell's telephone a little more than an hour before the attempted robbery and double homicide.  *Id.*

 i.  Response to the Order of Remand: Question 1

To the extent that the trial judge sustained objections to questions posed to Mendez Collier, the ruling was wrong and constituted an abuse of discretion under New York law. Nevertheless, as the discussion above makes clear, other testimony that the judge admitted significantly compensated for the alleged prejudice that Bell may have suffered.  For this reason, and because of the other corroborating evidence described above, admission of the objected-to evidence would not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.  As the discussion above concludes, "it is virtually impossible for a defendant to succeed in persuading a jury that his confession, corroborated by an eyewitness identification, the confession of an accomplice, and by other circumstantial evidence, was untrue without taking the stand and explaining why he confessed."

 ii.  Response to the Order of Remand: Question 2

Bell's argument with respect to the prosecutor's summation relates to one objection to a question posed to Collier asking whether, while he was at the precinct, Collier "hear[d] any police officer yell out or threaten George."  Tr. 12493.  Bell claims that the harmfulness of the error excluding this testimony was compounded by the prosecutor's argument in summation that there was "no evidence of threats, coercion, force, promises" made to Bell.  Tr. 13148.  This is another example of an unseemly statement by the prosecutor arguing the absence of evidence to which he objected.  Nevertheless, for the same reason that the initial error was harmless, I am unable to conclude that any incremental prejudice warrants relief.  As I observe above, "it is clear from the record that this incident—assuming it occurred—must have taken place prior to

4:30 a.m., when Bell's interrogation began.   Bell and Collier were questioned in different rooms."   Moreover, Detective Pia's testimony established that Bell was nervous, fidgety and cried during the interrogation.  Tr. 11860.  Collier was also permitted to testify that when Bell was handcuffed he appeared sad and was crying.  Tr. 12473.  More significantly, Collier testified that he himself was yelled at and threatened, and that the police unsuccessfully attempted to coerce him to confess.  This testimony, if believed by the jury, provided a significant basis for the jury to infer that Bell was treated similarly.  Indeed, in his summation, Bell's counsel argued to the jury that "[Collier] says that he saw George Bell in the precinct.  He saw him looking sad, he saw him crying and he saw him clearly under the control of the police officers.  The police had gotten to him, that's what happened here."  Tr. 13063.   Under these circumstances, the prosecutor's summation on this issue did not significantly compound the impact of the evidentiary ruling.

Evidentiary Rulings Related to Jason Ligon: Excerpt from Original Memorandum & Opinion

Based in part on the statements of Bell, Bigweh, and Johnson that a person named "Jason" was the getaway driver, Jason Ligon was arrested on May 30, 1997, more than five months after Bell's arrest.  (Jason Ligon is the son of Bertha Ligon, the witness discussed above who later testified for the defense at Bell's trial.)  Ligon confessed to Detective Bovino and Detective Maryann Bubelnick that he was the getaway driver.  Detectives Pia and Sica, who took Bell's statement, were not involved in taking Ligon's statement.  Ligon was indicted in June, 1997 for second-degree felony murder, pursuant to Queens County Indictment No. 1893/97.

Sometime before January 1999, Ligon recanted his statement and said that he was not present at the crime scene.  In October 1999, several months after Bell's trial, Assistant District Attorney Brad A. Leventhal interviewed Bigweh for the first time.  At that time, Bigweh said

44

that Jason Ligon was not the driver.  After an investigation, the District Attorney's Office concluded in May 2000 that the case against Ligon should not proceed.  ADA Leventhal then interviewed Ligon, who said that he had falsely confessed in the hope of obtaining a benefit in connection with federal drug charges pending against him in the District of Columbia.  He said that he thought he would be treated as a cooperating witness, not as a murder defendant, and that he had learned details of the crime from his mother, other sources in the neighborhood, and the police.  On June 15, 2000, the indictment against Ligon was dismissed.

On direct examination, as previously noted, Lieutenant Nevins testified that after he spoke to Bigweh, he assembled a team to visit the homes of Bell, Johnson, Bolt, and "Jason."  On cross-examination, Lieutenant Nevins was shown a "tactical plan," Def. Ex. F, which contained the names and addresses of persons to be arrested on that date.  The plan indicated that one of the names was "Jason," who (at that point) had been implicated by Bigweh, that this person lived on 105th Street between 32nd Avenue and Astoria Boulevard, and that he did not know this person's full name.  The trial judge, however, sustained objections to questions asking whether Lieutenant Nevins ever arrested a person named Jason at this address, Tr. 11719-20, and whether he had a description of what "Jason" looked like.  Tr. 11720.

> Bell argues that
>
> [e]vidence regarding an additional suspect, who may have been released, is highly relevant because it may show that the police investigation was sloppy or that the State's witnesses are unreliable.  Moreover, if Jason had no connection to the case, then it raised doubts about the reliability of both Bigweh's tip and Mr. Bell's statements to the police.

Mem. of Law in Supp. of Pet. for a Writ of Habeas Corpus 35, ECF No. 5.  This argument is problematic for a number of reasons.  Bell never apprised the trial judge that this was the purpose of the two questions that were posed to Nevins, nor was the relevance of the questions obvious.

45

*See Jones v. Berry*, 880 F.2d 670, 673 (2d Cir. 1989) ("[A] party whose prospective questioning is threatened with curtailment should make all reasonable efforts to alert the court to the relevance and importance of the proposed questions.").[4]   Moreover, the answers to those two questions would have hardly established that the investigation was sloppy or that the prosecution witnesses were unreliable.  Whether Nevins ever arrested Jason, by itself proves nothing.  The same is true with respect to whether Nevins had a description of Jason on the date on which Bell and his accomplices were arrested.  Moreover, the jury heard testimony that, when the charges were filed against Bell and his co-defendants on December 26, 1996, a little more than a day after their arrest, Jason was not one of those charged, Tr. 11996-97, a fact from which it could have concluded that Jason's role in the case may not have been that which Bell or Bigweh attributed to him.

These considerations aside, "[m]erely showing that an investigation is sloppy does not establish relevance." *United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001), *cert. denied*, 535 U.S. 910 (2002).  Rather, the "sloppy investigation" evidence must be related to a specific issue in the case.  *Id.* at 22-23.  The evidence relating to the investigation of "Jason" was not relevant to any issue in Bell's trial.  Moreover, "[s]uch speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value."  *Id.* at 23.

     i.     Response to the Order of Remand: Question 1

---

[4]   Although the Second Circuit doubted there could be error where counsel fails to make a record, it presumed the limitation on cross was erroneous because the Appellate Division had rejected the appeal on harmless error grounds.  *See Jones v. Berry*, 880 F.2d 670, 674 (2d Cir. 1989).

The exclusion of this evidence is not error because, as noted above, Bell never apprised the trial judge of the relevance of this proposed evidence.  Indeed, in *Jones*, the Second Circuit expressed doubt that there could be error when counsel fails to make a record, although it presumed the limitation on cross was erroneous because the Appellate Division had rejected the appeal on harmless error grounds.  *See Jones v. Berry*, 880 F.2d 670, 673-74 (2d Cir. 1989).  More significantly, I do not understand how the trial judge can be accused of abusing discretion in excluding evidence when the purpose of the evidence was never described to him and was not otherwise obvious.  *C.f.* 1 CHRISTOPHER B. MILLER, & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 1:13 (3d ed. 2007) ("Excluding evidence where no offer of proof was made is unlikely to be construed as 'plain error' because (in the words of the [Advisory Committee Notes]) the absence of the offer is 'likely to produce a record which simply does not disclose the error.'").

Moreover, even if the two questions to Lieutenant Nevins that were disallowed were answered in the manner most favorable to Bell, it would have proven only that Jason was not arrested by Nevins at the location given by Bigweh and that Bigweh had given Nevins some physical description of Jason.   These answers would have established neither that the investigation was sloppy nor that the unspecified State witnesses were unreliable.  Indeed, those answers, if relied upon for the purpose suggested in the petition here, would have opened the door to testimony that Jason Ligon was arrested on May 30, 1997, and that—in a confession given to detectives other than those who questioned Bell—he admitted that he drove the getaway car.  While he recanted that confession shortly before Bell's trial, this would hardly have cast doubt on the confession of Bell or Bigweh's statements, which corroborated each other with respect to Bell's guilt and which were corroborated by other evidence.  Nor would the mere fact

47

that Ligon recanted the confession have established that it was false.  While the case against him was ultimately dismissed, this did not occur until long after Bell was tried and convicted.

In sum, the ruling on the questions put to Lieutenant Nevins was not erroneous.  There are sound reasons of policy for requiring a defendant to alert the trial court to the relevance and importance of proposed questions.  Where the defendant fails to do so, it is simply impossible to conclude that the trial judge abused his discretion in excluding the evidence, or for the Appellate Division to conclude that the exercise of discretion was unreasonable.  *Watson*, 640 F.3d at 510. Finally, the probative value of this evidence is so slight that admission would not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.

### ii.   Response to the Order of Remand: Question 2

Bell makes no arguments in his post-remand memorandum, or as far as I can find, anywhere else, that the summation compounded the error in the trial court's ruling on the cross-examination Lieutenant Nevins.

### 3.   Evidentiary Rulings Regarding Reginald Gousse

In this third, and final, category, Bell contends that he was denied due process with regard to the testimony of jailhouse informant Reginald Gousse.  Specifically, Bell claims it was error (1) to allow Gousse to inaccurately state, without correction by the court, what he believed to be his likely sentence had he not cooperated with the government in this case, and (2) to disallow Bell's counsel's introduction of extrinsic evidence—as well as most questioning—as to whether Gousse had access in prison to news clippings and Bell's personal files describing the details of Bell's crime after Gousse had denied having any such access.

<u>Gousse's Potential Sentence: Excerpt from Original Memorandum & Opinion</u>

Gousse, the jailhouse informant, testified that Bell admitted to the robbery and murders. Gousse said that Bell made threats against ADAs Reese, Morse and Dorfman, and that after hearing these threats, he contacted ADA Lasak in September 1998.  He testified that, at that time, he had not received any promises, but that by contacting the District Attorney's Office, he hoped to obtain leniency in connection with his pending charges.  Gousse further testified that he entered into a formal cooperation agreement with prosecutors in February 1999.  Pursuant to the agreement, he pled guilty to the charges pending against him.  Gousse expected that, as a result of his cooperation, his sentence would be reduced from twenty-one years to five years in prison. The cooperation agreement was entered into evidence during the prosecution's redirect examination.

During cross-examination, the trial judge sustained objections to questions asking whether Gousse knew that, based on his prior felonies, he had achieved persistent-felon status, that he could be sentenced to life in prison on account of the charges pending against him, and that he faced twenty-five years in prison on each of three separate charges in the indictment. Pursuant to the cooperation agreement, Gousse would receive a five-year sentence if he testified truthfully and a twenty-one-year sentence if he did not.  Under cross-examination, Gousse testified that he believed that, had he not pled guilty and instead gone to trial, he could have been sentenced to fifteen to twenty years in prison.  Bell argues that this testimony was "false" because Bell "was eligible for lifetime imprisonment, as either a discretionary persistent or persistent violent felony offender," Mem. of Law in Supp. of Pet. for a Writ of Habeas Corpus 40-41, ECF No. 5, and that "[d]espite counsel's objections, the court [] refused to correct

Gousse's false testimony that, if he had not cooperated and been convicted of pending charges, he could have received fifteen to twenty years' imprisonment. (Tr. 12179, 12203-5)." *Id.* at 40.

The record, however, does not indicate that the trial judge was asked to correct this testimony. Instead, the argument focused on questions Bell should have been permitted to ask on this issue. Tr. 12204. Moreover, Gousse's testimony can hardly be characterized as false. When the issue was addressed in a colloquy after Gousse testified, an argument ensued as to whether a Youthful Offender conviction in Florida, which presumably triggered the sentence Bell's argument suggested, actually had this effect. Bell cited a case that held that it did, *People v. Kuey*, 83 N.Y. 2d 278 (1994), contrary to the argument that the District Attorney continues to press here. Gousse, however, was not a lawyer, and there is simply no basis to argue that his testimony as to the sentence he believed he could receive was false, as opposed to possibly being inaccurate. In any event, the issue germane to Gousse's credibility was his perception of the sentence he would have received. On this score, it is beyond dispute that Gousse received a substantial benefit for his cooperation, pursuant to an agreement defense counsel characterized in his summation as "the deal of the century," Tr. 13045, and the jury was able to evaluate his credibility in light of that fact and other factors that went to the issue of his credibility.

    i.   Response to the Order of Remand: Question 1

First, I acknowledge that, contrary to my original discussion of the record above, Bell's counsel did ask the court to instruct the jury as to the sentence that Gousse faced, Tr. 12286, although I may have missed it because it came approximately eighty transcript pages after Gousse's testimony on this issue. Nevertheless, it is not without significance that, after making the request, Bell's counsel stated that, "I anticipate the Court's reaction that it's the witness' knowledge that's relevant, and of course, it is the witness' knowledge that's relevant, and I

believe . . . that there's ample room to believe that this witness would be knowledgeable about these areas." Tr. 12286.  Moreover, as the trial judge added, "you know lawyers don't know the law on many occasions.  And we have to assume that [Gousse] knows all of these things . . . ." Tr. 12288.

The trial court's refusal to instruct the jury, as requested by Bell's counsel, involves a judgment about its probative value as it relates to Gousse's credibility and to the possibility that the jury might unfairly conclude that he was lying when he was merely misinformed about a legal issue.  Moreover, for this reason, I am unable to find that the trial court "so clearly abused its discretion that the state appellate court's failure to find an abuse of discretion was an unreasonable application of clearly established federal law."  *Watson v. Greene*, 640 F.3d 501, 512 (2d Cir. 2011).  This consideration aside, even if it did constitute such a clear abuse of discretion, inclusion of the requested instruction would not have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.

   ii.  <u>Response to the Order of Remand: Question 2</u>

Bell argues that the prosecutor exploited this ruling during summation by arguing that Gousse's benefit for testifying was minimal, stating that Mr. Gousse is "going to get five years . . . [f]ive years which he will spend in prison as a known informant."  Tr. 13096.  Because the trial court's ruling was not in error, the prosecutor's statements here did not add to the collective prejudicial impact of any erroneous evidentiary rulings.  Moreover, even if the prosecutor's statement crossed the line, I am unable to find that it affected the result.

<u>Bell's Court Papers and Newspaper Clippings: Excerpt from Original Memorandum & Opinion</u>

After Gousse denied having access to Bell's court papers and press accounts of the crime during cross-examination, the trial court precluded the defense from introducing evidence that

Bell possessed those materials at Rikers Island.  Tr. 12743 *et seq*.  The trial judge also sustained objections to some, but not all, defense questions regarding Gousse's familiarity with press accounts.  Specifically, the trial judge sustained objections to questions in which Gousse was asked whether Bell possessed a file of court papers and newspaper clippings at Rikers Island. Bell alleges that the evidence he was seeking to elicit was relevant to his argument that Gousse fabricated the details of Bell's confession, because "Gousse's account, like that contained in the *Daily News*, got the number of shots fired wrong; Gousse described the incident as an 'ambush,' and another article used the very same term; and, he referred to Mr. Bell in the same formal way as the court papers—'George Davis Bell.' (12092-93, 12183-85, 12210-14)."  Mem. of Law in Supp. of Pet. for a Writ of Habeas Corpus 40, ECF No. 5.

The district attorney argues that Bell was permitted to ask Gousse if he had access to the papers and clippings and that Bell was "bound by that answer."  Mem. of Law in Opp. to Pet. for a Writ of Habeas Corpus at 98, ECF No. 6.  According to the District Attorney, Bell was precluded from "show[ing] through extrinsic evidence that Gousse lied about Bell being the source of his information."  *Id.* at 99.  This argument reflects a fundamental misunderstanding of the rule that a cross-examiner is bound by the answer of the witness inquired into to affect credibility.  The rule applies only to questions suggesting generally that the witness is not credible.  Thus, "[a]n inquiry on cross-examination as to an immoral or criminal act of the witness for the sole purpose of affecting his credibility is an inquiry concerning a collateral matter" that may not be challenged by the admission of extrinsic evidence.  RICHARDSON ON EVIDENCE § 491 (Jerome Prince ed., 10th ed. 1973).  On the other hand, answers to questions that have a direct bearing on an issue in the trial do not come within the rule precluding the introduction of evidence relating to collateral matters.  *Id.*; *see also People v. Hudy*, 73 N.Y.2d

40, 56 (1988).  "'Direct,' in this context, means any evidence tending to prove the proponent's case on the merits or to disprove the opponent's, even though this 'direct' evidence, if believed, might also contradict, undermine or discredit a witness."  PRINCE, RICHARDSON ON EVIDENCE § 6-305 (Richard T. Farrell ed., 11th ed. 1995).  The issue of whether Gousse falsely testified that Bell confessed to him goes to the heart of the case; it is absurd to suggest that extrinsic evidence relevant to that issue is collateral.

Moreover, the collateral matter rule addresses the issue of the admission of evidence for the purpose of impeaching testimony elicited on cross-examination.  If evidence is otherwise admissible, it does not fall under the scope of the rule.  PRINCE, RICHARDSON ON EVIDENCE § 6-305 (Richard T. Farrell ed., 11th ed. 1995).  As the New York Court of Appeals held long ago: "The relations which a witness has to the case, or to a party, threats made by him, the fact that a party tried to bribe him, the fabrication, destruction or concealment of evidence and the like, may be shown."  *Hoag v. Wright*, 174 N.Y. 36, 45-46 (1903); *see also People v. Perez*, 100 A.D.2d 366, 385 (2d Dept. 1984), *rev'd on other grounds*, 65 N.Y.2d 154 (1985).  Because the proffered evidence was relevant to the argument that Gousse fabricated his testimony regarding Bell's confession, it was independently admissible.  PRINCE, RICHARDSON ON EVIDENCE § 6-305 (Richard T. Farrell ed., 11th ed. 1995).  The fact that Gousse denied fabricating the confession on cross-examination cannot prevent Bell from offering circumstantial evidence to prove that Gousse's testimony on direct was false.  On the contrary, as the New York Court of Appeals more recently observed, "the trial court's discretion in this area is circumscribed by the defendant's constitutional rights to present a defense and confront his accusers."  *Hudy*, 73 N.Y.2d at 57 (citations omitted).

While the ruling precluding the evidence proffered by Bell was plainly erroneous, the evidence was a double edged sword. On one edge, it provided some circumstantial support for the argument that Gousse may have fabricated the confession from newspaper articles and court papers, while on the other, it corroborated Gousse's testimony that he discussed the case with Bell. Indeed, Bell does not allege that all of the details of his statements that Gousse testified to were a matter of public record. My impression is that they were not. Thus, even if the jury concluded that Gousse had seen these articles, it would not have conclusively established that he fabricated the substance of his testimony. More significantly, given the other evidence of Bell's guilt, I am persuaded that Bell would have been convicted without Gousse's testimony, which was subject to a devastating attack on cross-examination based on his criminal record and the consideration he received for his testimony. Consistent with this premise, during its deliberations, the jury told the trial judge that it did not want to hear a read-back of Gousse's testimony, shortly after it was initially included on a list of evidence that the jury requested. Tr. 13406-07.

 i. <u>Response to the Order of Remand: Question 1</u>

The trial judge's ruling precluding the defense from introducing evidence that Bell possessed court papers and newspaper clippings in prison was contrary to New York law. Nevertheless, a rereading of the transcript disclosed the following colloquy relating to Bell's possession of his court papers:

> Q: Sir, it's common isn't it for inmates to have documents relating to their case at Rikers Island?
> Mr. Testagrossa [the ADA]: Objection.
> The Court: Sustained. *It's common*.

Tr. 12183 (emphasis added). This response by the trial judge that it is common for inmates to have documents relating to their case at Rikers Island mitigated the prejudice to Bell from the

ruling of which he complains here.  The response enabled Bell to argue that Gousse had obtained the details contained in Bell's confession from papers that Bell possessed.  Moreover, as I also indicated above, had Gousse testified to having seen papers in Bell's cell, it would have corroborated Gousse's testimony that he discussed the case with Bell.  Finally, even if this evidence had been presented to the jury exactly as Bell desired, I do not believe that it would have created a "reasonable doubt that did not otherwise exist."  *Hawkins*, 460 F.3d at 244.

        ii.      <u>Response to the Order of Remand: Question 2</u>

Bell argues that the prosecutor's summation exploited the trial court's ruling excluding evidence that Bell had court papers and newspaper clippings in his possession.  Specifically, Bell complains that "directly relying on the erroneous preclusion, the prosecutor asked the jury 'where,' if not from Mr. Bell, would those details [of Bell's crime] have 'come from.'"  Pet.'s Mem. Law 78, ECF No. 37 (citing Tr. 13159).  First, this argument ignores the fact that the trial judge told the jury that it was "common . . . for inmates to have documents relating to their case at Rikers Island."  Tr. 12183.  This was a clear potential source of the information Gousse had about the details of Bell's participation in the crime.  This consideration aside, as indicated in the discussion above on harmless error, in my view, the jury would have reached the same verdict with or without Gousse's testimony or the prosecutor's unseemly argument.

In sum, as I observed earlier, unseemliness does not add significantly to the cumulative impact of this erroneous evidentiary ruling and is not a basis to grant a writ of habeas.  *See United States v. Hasting*, 461 U.S. 499, 507 (1988).  On the contrary, as the Supreme Court has held, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations and citations omitted).  This standard requires the reviewing court to consider the prosecutor's comments in the entire context of the trial.  *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

## II

I address here the third question posed by the Court of Appeals that asked me to "[c]larify the evidentiary basis for the 'confession of an accomplice' [I] referenced . . . as well as the weight this 'confession' received in [my] harmless error analysis."  *Bell v. Ercole,* No. 08-3539, 2010 WL 726023, at *4 (2d Cir. Mar. 4, 2010), quoting *Bell v. Ercole*, No. 05-4532, 2008 WL 2484585, *11, 18 (E.D.N.Y. Jun. 20, 2008).  While I do not set forth the entire discussion of this issue that lead to the request for clarification, the following is specifically relevant to my response.  The Court of Appeals observed that "[i]n its harmless error analysis . . . the district court seems to have reasoned that the jury heard evidence of an accomplice's confession implicating Bell, to which Bell failed to object."  *Bell v. Ercole,* No. 08-3539, 2010 WL 726023, at *4 (2d Cir. Mar. 4, 2010).  One theory posited by the Court of Appeals for this conclusion is that,

> the jury did hear an implicit accusation by an accomplice implicating Bell, to which defense counsel failed to object, because the jury heard that: (1) Bigweh had information about the crime, Tr. 11690, and was involved in the crime, Tr. 11829, 11964-65; (2) Detective Nevins, as a result of meeting with Bigweh, convened a "tactical meeting" to "apprehend an individual," Tr. 11659; (3) Detective Nevins then staked out Bell's home, Tr. 11662, "apprehended" Bell, "[p]laced him against the wall," "frisked him," and "handcuffed him," Tr. 11669; and (4) Bell "was arrested as a result of a co-defendant of his by the name of Bigweh" and was thereafter upset "that Bigweh had ratted him out," Tr. 12092-

56

> 96.   If the district court adheres to its harmless error analysis based on the accomplice confession, it should address this issue as well.

*Bell v. Ercole,* No. 08-3539, 2010 WL 726023, at *4 (2d Cir. Mar. 4, 2010).  This is an accurate interpretation of my analysis.   Indeed, aside from the evidence discussed in this foregoing excerpt, Bell's counsel told the jury in his opening that Bigweh gave Lieutenant Nevins four names, including Bell and Gary Johnson.  Tr. 10990.  Moreover, Lieutenant Nevins testified that, as a result of the meeting with Bigweh, he convened a tactical meeting, not only to "apprehend an individual," but to specifically go to the homes of each of the four individuals Bigweh had named.  Tr. 11660-61, 11716-19.  The jury also heard testimony that, after Bell confessed, the detectives who questioned him went back to see him to "inquire why he was the only one that implicated an individual named Carl [Mendez Collier] in this investigation."  Tr. 11964.  In response, Bell stated, "that the individual that he had implicated earlier as Carl, he basically falsely accused in that he implicated Carl instead of [Bigweh] [because] he was frightened of [Bigweh] and he felt that if he implicated [Bigweh] that he would cause danger to his family and also to himself while in jail."  Tr. 11829; *see also* Tr. 11964-65.  This establishes, if more were necessary, that Bigweh was an accomplice of Bell.

My analysis, which the Court of Appeals described above, is set out in footnote two of my opinion, albeit in an abbreviated form.  There I observed that although Bigweh's confession "did not explicitly identify Bell as a participant in the offense . . . it contains an accusation that was plainly implicit."  *Bell v. Ercole*, No. 05-4532, 2008 WL 2484585, *2 n.1 (E.D.N.Y. Jun. 20, 2008) (citing *Mason v. Scully*, 16 F.3d 38, 42-43 (2d Cir. 1994); *see also People v. Tufano*, 415 N.Y.S.2d 42, 69 A.D.2d 826, 827 (2d Dep't 1979)).  Indeed, in *Mason v. Scully*, I granted a writ of habeas corpus in a case in which the jury heard testimony that, as a result of a conversation with a person identified as a participant in a jewelry store robbery, the detective was looking for

the defendant.  *Mason*, 16 F.3d. at 40.  The defendant's counsel had not objected to the question that elicited this response.  *Id.*  The writ was granted on the ground that the failure to object deprived the defendant of the effective assistance of counsel.  In affirming the grant of the writ, the Court of Appeals held that, "[t]o implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly but may contain an accusation that is only implicit."  *Mason*, 16 F.3d 42-43; *see also United States v. Gomez*, 617 F.3d 88, 96-97 (2d Cir. 2010).  This is precisely the basis for my conclusion in this case that the testimony of Lieutenant Nevins regarding his conversation with Bigweh, by itself, or when taken together with other evidence in the case, plainly conveyed to the jury that Bigweh—an accomplice—had implicated, among others, Bell and Gary Johnson, who was in Bell's apartment at the time Lieutenant Nevins arrived to make the arrest.

Under these circumstances, it is not clear to me why this issue was remanded to me for clarification, although I assume from the earlier discussion in the Court of Appeals opinion that it was troubled by the fact that I may not have identified sufficient evidence to establish that Bigweh was an accomplice who had implicated Bell in his own confession.  The foregoing discussion of the evidence should allay that concern.  Moreover, the allusion of the Court of Appeals to the admissibility of the statement, if a proper objection had been made, does not affect the use that could be made of it by the jury when, as here, it was admitted without objection.  Particularly apposite here is an opinion by then-Judge Thurgood Marshall, in which he concluded that it was unnecessary to reach the merits of an argument that inadmissible hearsay was offered into evidence without objection, because "if hearsay evidence 'is admitted without objection, it is to be considered and given its natural probative effect as if it were in law admissible.'"  *United States v. Brown*, 348 F.2d 661, 663 (2d Cir. 1965), quoting *Diaz v. United*

*States*, 223 U.S. 442, 450 (1912); *see also Arenowski v. Spencer*, 424 F.3d 285, 294 n.1 (2d Cir. 2005); 1 CHRISTOPHER B. MILLER, & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 1:6 n.6 (3d ed. 2007).

The second half of the third question remanded for clarification is the weight that Bigweh's confession implicating Bell had on my harmless error analysis. *Bell*, 2010 WL 726023, at *4. This is a question that is difficult for me to answer. The importance of this one piece of evidence is unquantifiable because I did not consider it in isolation. When I did refer to Bigweh's implication of Bell in my harmless error analysis, three times by Bell's count, *see* Pet.'s Mem. Law 86, ECF No. 37, I linked it together with uncontroverted evidence, which I set forth in the same paragraph that I discuss Bigweh's statement. Thus, I observed that as a result of the telephone call Bigweh placed to Bell just prior to the arrival of Lieutenant Nevins, Bell and "Gary Johnson left Bell's apartment (in the same neighborhood as the scene of the crime) and were arrested on the street by Lieutenant Nevins . . . Significantly, telephone records established that, at 5:55 a.m., a little over an hour before the [crime], Gary Johnson, whom Bell and Bigweh implicated in their confessions, called Bell's house twice, during which there were very brief conversations." *Bell*, 2008 WL 2484585, *2. The circumstances describing the arrest established that Bigweh, Bell, and Johnson each knew each other, although this fact was conceded in the opening statement of Bell's counsel. Moreover, the telephone records provide compelling evidence that Bell and Johnson were in communication with each other shortly before the attempted robbery and murders took place in the neighborhood in which they lived. Indeed, during its deliberations, the jury asked for the telephone logs of the calls Gary Johnson

made to Bell's telephone line.[5]   Tr. 13365.   In my judgment, these records were the most compelling corroborative evidence.   In sum, I viewed Bigweh's statement, his successful effort to get Bell and Johnson to leave Bell's apartment and, most of all, the telephone records as three interlinked words of a crossword puzzle that helped fill the remaining gaps.

There is one last comment to be made on this issue.   On remand, Bell's counsel filed a memorandum which was essentially a petition for rehearing.   Regarding Bigweh's statements implicating Bell, she argues that these statements "were not admitted for their truth and the jury was properly instructed not to draw any inferences from their existence; indeed, their admission would have violated Mr. Bell's right to confrontation."   Pet.'s Mem. Law 4, ECF No. 37.   These arguments are each without merit.

First, while Bell's counsel argues that Bigweh's statements were not admitted for their truth, the jury was never told the purpose for which they were admitted.   Indeed, a limiting instruction was never given and, if *Bruton v. United States*, 391 U.S. 123 (1968) applies to implied hearsay of an accomplice, such an instruction may not even have been adequate.   More significantly, the instruction upon which Bell relies came at a point in the testimony of Lieutenant Nevins not directly related to the statements at issue.   Indeed, it came thirty-two transcript pages later during the cross examination of Lieutenant Nevins, Tr. 11693, and it could

---

[5]   In particular, these corroborating circumstances were also mentioned in the two instances quoted in the Second Circuit's remand order.  *Bell*, 2010 WL 726023, at *3; *see, e.g., Bell*, 2008 WL 2484585 at *11 (stating that "it was unlikely that the jury would discredit Turnbull's identification as a lie in order to obtain a reward, when the person he selected *had previously confessed* and had been implicated in a confession of an accomplice.") (emphasis added); *Id.* at *16 (stating that "[s]uch an outcome is particularly unlikely in a case in which an eyewitness and an accomplice corroborated the confession, and in which telephone records established that sixty-five minutes prior to the attempted robbery and double-homicide, Gary Johnson . . . called petitioner's home.").

only have had the opposite effect than that suggested by Bell's counsel.  Specifically, the trial

judge gave the following instruction:

> The Court sustains objections and basically we deal with the rules of
> evidence.  One particular one concerns subject matters of hearsay; and that is in
> reference to what somebody may have said outside of the courtroom, not what a
> witness on the stand said, but what somebody else said.  There is no way of
> examining what somebody else outside the courtroom might have said.  *So there
> is a general rule that we don't allow that.  Of course, there is an exception.  There
> are exceptions to the rule.*
> *Where there are exceptions the Court does allow those questions and the
> answers.  But if there is no exception, then the general rule is we don't allow it.*

Tr. 11693 (emphasis added).[6]  Because the trial judge allowed testimony of Bigweh's implied

hearsay statements, the jury listening to, and following, this instruction could only assume that

this testimony came within an exception to the general rule and could be considered by them.

Indeed, as I observed above, the jury was told by Bell's counsel during his opening statement

that Bigweh had implicated Bell, among others.  Tr. 10990.

Bell's counsel also argues that, at most, "this testimony was admitted solely as

background information to explain why the police arrested Mr. Bell, with the arrest itself a fact

of no probative value."  Pet.'s Mem. Law 88-89, ECF No. 37.  Passing over the fact that the jury

was not apprised of the limited purpose of the testimony, this argument ironically mirrors the

unsuccessful one made and by prosecutors who try to use the state of mind exception to justify

the admission of largely irrelevant evidence, the purpose of which is only to put before the jury

otherwise inadmissible statements of an accomplice or a third party.  As the Second Circuit has

---

[6]  This instruction was given after petitioner's counsel attempted to elicit an explicit detail of
Bigweh's statement.  As he later explained at a sidebar, the purpose of his question was intended
to establish that Bigweh was told to make up a story to trick petitioner and Johnson to come out
of petitioner's apartment.  Tr. 11700.  The relevance of this testimony is unclear.  *See* Tr. 452.  In
any event, the trial judge allowed Lieutenant Nevins to testify to the details of the story that he
asked Bigweh to makeup.  Tr. 11713.  Moreover, this discrete issue was not raised on appeal.
Consequently, it is not exhausted and procedurally forfeited.  *See Grey v. Hoke*, 933 F.2d 117
(2d Cir. 1991).

61

held, although hearsay may sometimes be admitted "to prove relevant facts other than the truth of what was asserted," this is not the case "when the evidence sought to be justified in its nonhearsay use is on the unimportant issue of investigative background, and it has considerable capacity in its improper application for substantial prejudice to the defendant on the crucial issue of proof of guilt." *United States v. Johnson*, 529 F.3d 493, 500 (2d Cir. 2008); *see also United States v. Gomez*, 617 F.3d 88, 92 (2d Cir. 2010) (observing that "in this case, the main import of the challenged evidence is not what it furnished as background, but rather its demonstration that Rivas identified Gomez as his supplier."); *Ryan v. Miller*, 303 F.3d 231, 252-53 (2d Cir. 2002). These comments are equally applicable to the facts of this case. The reason why Lieutenant Nevins arrested Bell was barely relevant. Lieutenant Nevins should have been permitted to testify only that Bell was arrested and to the events that followed. The fact that he was permitted to testify to more without objection does not change the fact that the jury was entitled to give it "its natural probative effect as if it were in law admissible." *Brown*, 348 F.2d at 663, (quoting *Diaz*, 223 U.S. at 450).[7]

## CONCLUSION

The parties are directed to apprise the Court of Appeals of the filing of this memorandum in response to the order of remand. I apologize for the delay in doing so. The order of remand was dated March 4, 2010. The parties, however, asked for permission to file post-remand memoranda. Petitioner's memorandum was not filed until June 27, 2010, almost four months

---

[7]  Bell also argues that the trial judge erroneously denied his "application to reopen the cross-examination of Pia to show that, while Pia was interrogating Mr. Bell, the police had reason to know that Mr. Bigweh was unreliable because his first statement contained 'facts they knew to be false.'" Pet.'s Mem. Law 91 n.15, ECF No. 37 (quoting Tr. 12013-15, 12023). This separate and discrete argument, along with the related argument made in the same footnote, were not raised in Bell's Appellate Division brief. Consequently, they are unexhausted and procedurally forfeited. *See Grey v. Hoke*, 933 F.2d 117 (2d Cir. 1991).

later.  The District Attorney's reply memorandum was filed on August 30, 2010.  By this time, over two years after my original memorandum and order was filed on June 20, 2008.  My response to the directive of the order of remand required me to reread extensive portions of a voluminous record.  Nevertheless, I should have accomplished this task and drafted this memorandum in less than fourteen months after the parties had completed their extensive post-remand briefing.

Brooklyn, New York
October 21, 2011

*Edward R. Korman*
Edward R. Korman